Filed 7/17/24  Marriage of Carter CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of SHANNON CARTER and STEVEN CARTER. | |
| SHANNON CARTER, | D080210, D081627 |
| Appellant, | |
| v. | (Super. Ct. No. 18FL005793C) |
| STEVEN CARTER, | |
| Appellant. | |

CONSOLIDATED APPEALS from judgments of the Superior Court of San Diego County, Patricia Garcia, Judge.  Affirmed in part, dismissed as moot in part, and reversed in part.

Cage & Miles and John T. Sylvester for Shannon Carter.

Moshtael Family Law and Daniel R. Knowlton; Knowlton Family Law and Daniel R. Knowlton for Steven Carter.

INTRODUCTION

Shannon and Steven Carter appeal from judgment in this marital dissolution action.[1]  The parties raise numerous issues, including as to temporary support arrears, the scope of spousal support, equity award treatment, vacation pay, and attorney fees.  We conclude the vacation pay award must be reversed for recalculation, but deem moot the argument that the trial court erred in calculating the arrears based on restricted stock units (RSUs) and performance restricted stock units (PRSUs), as the trial court has corrected that error.  We further conclude the parties establish no other reversible error, and affirm the remainder of the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Parties and Background*[2]

Shannon and Steven married in November 2007, and have two children, born in 2010 and 2012.  Before marriage, they lived in Iowa and moved to Tennessee, where Shannon pursued her Ph.D.  Steven practiced law in both states.  They then moved to California, where Shannon attended Stanford Law School.  Steven worked in a nonattorney role at Stanford.

---

[1]    As discussed *post*, the trial court properly entered a corrected judgment to address clerical error.  The parties appeal from both judgments (and an October 12, 2021 order we need not and do not reach separately), and we now grant Shannon's deferred motion to consolidate the appeals.

[2]    The trial court granted Shannon's motion to seal her income and expense declaration, stating it "confirm[ed] the sealing of [her] financial information . . . ."  The parties filed briefs and appendices here that redacted public information, like facts disclosed at trial and elsewhere in the briefs and record.  The parties have stipulated the redacted information in their briefs and appendices no longer meets the requirements for sealing, this court so found, and we unsealed the records.

After law school, Shannon initially worked at an intellectual property law firm.

She began working for Arena Pharmaceuticals (Arena) in 2013, where she earned a salary, bonus, and equity compensation, including stock options. Steven worked in nonattorney roles at the University of California, San Diego (UCSD) from 2008 until 2017, when he became mostly unemployed for a period of time.

B.      *Dissolution Proceedings*

On May 15, 2018, Shannon filed for divorce.  Later that month, Steven filed a Request for Order (RFO) for child and spousal support, including a percentage of Shannon's bonus income under *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33 (*Ostler-Smith*).  The dissolution proceedings went on for several years, including as to temporary support issues. Pertinent here, the trial court initially set *Ostler-Smith* percentages at a September 2018 hearing, and ultimately awarded them as arrears after trial, while setting a retroactive jurisdiction date of July 31, 2020, for support generally at a pretrial hearing.

The case went to trial in October 2021.  Shannon was still at Arena, and after doing some consulting work in previous years, Steven had obtained a nonattorney job at University of California, Berkeley.  After the trial court confirmed the retroactive jurisdiction date, Shannon's counsel requested a trial continuance, which the court denied.

At trial, the court heard testimony from the parties; joint expert Elizabeth Van Clief, who provided calculations for allocating Shannon's stock options under *In re Marriage of Hug* (1984) 154 Cal.App.3d 780 (*Hug*) and *In re Marriage of Nelson* (1986) 177 Cal.App.3d 150 (*Nelson*); Karen Kaseno, Steven's expert on income available for support; and Kate Scanlon

3

(sometimes spelled "Cate" in the record), the person most knowledgeable on Arena compensation. The parties also introduced numerous exhibits, including Van Clief and Kaseno's reports.

The trial court issued its decision from the bench. The court: (i) determined it had jurisdiction to, and did, apply the *Ostler-Smith* percentages to set temporary support arrears on Shannon's bonus and stock options from 2019 to 2021; (ii) set spousal support at $1,000 monthly plus an *Ostler-Smith* percentage, with a $35,000 annual cap and termination date of September 30, 2023; (iii) addressed equity award treatment, including selecting the *Nelson* allocation method for stock options; (iv) adopted Steven's vacation pay calculations; and (v) awarded some, but not all, attorney fees requested by Steven.

C. *Statement of Decision and Judgment*

In November 2021, Shannon filed a request for statement of decision regarding a number of issues, including the *Ostler-Smith* arrears, and the parties filed proposed statements of decision and objections. The record does not reflect Steven filed his own request for a statement of decision. In January 2022, the trial court entered a Statement of Decision on the matters identified by Shannon.

On February 28, 2022, the trial court entered the judgment. Steven moved for reconsideration (based on a purchase offer for Shannon's company), and requested set aside due to fraud (based on her counsel's preparation of the judgment). Shannon moved to set aside to address clerical error. At an October 5, 2022 hearing, the court denied Steven's motions and entered a corrected judgment, nunc pro tunc. The support arrears totaled $545,217,

4

the vacation pay award was $21,368, and the attorney fee award was $30,000.  Both parties appeal.[3]

DISCUSSION

Each party contends the trial court erred in numerous ways, as we shall address.  We conclude there is just one reversible error:  the vacation pay calculation.  Although the trial court also erred in calculating arrears based on the RSUs and PRSUs, it has since corrected that error and the issue is moot.

A.    *Overview of Applicable Law*

1.    *Standard of Review*

"We apply a substantial evidence standard of review to the trial court's findings of fact." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)  " 'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." ' " (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94 (*Ciprari*).)  " 'We may not reweigh the evidence and are bound by the trial court's credibility determinations.' " (*Ibid*.)

Further, the "doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58 (*Fladeboe*).)  To avoid implied findings, a party must obtain a statement of decision and "bring ambiguities and omissions in [its] factual findings to the trial court's attention . . . ." (*Id*. at p. 59.)  The " 'substantial

---

[3]    We grant Steven's motion to augment his notice of appeal from the corrected judgment.

5

evidence standard applies to both express and implied findings of fact' " in the statement of decision. (*Ciprari*, *supra*, 32 Cal.App.5th at p. 94.)[4]

For a discretionary decision, we consider " 'whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion.' " (*In re Marriage of Macilwaine* (2018) 26 Cal.App.5th 514, 527 (*Macilwaine*); *ibid.* [we "confine ourselves to determining whether any judge could have reasonably made the challenged order"].) " 'As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it.' " (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1443 (*Blazer*).)

"Where a question of law is presented on undisputed facts, appellate review is de novo." (*Blazer, supra,* 176 Cal.App.4th at p. 1443.)

Finally, "error alone does not warrant reversal." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822–823 (*Falcone*).) " 'The burden is on the appellant in every case to show that the claimed error is prejudicial; i.e., that it has resulted in a miscarriage of justice.' " (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337.)

2.    *Appellate Briefing Requirements*

Briefing must be supported by reasoned argument, authority, and accurate citation to the record, or forfeiture may result. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 (*Badie*) ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."]; *WFG*

---

4      Steven suggests the doctrine of implied findings does not apply if there is a reporter's transcript, citing *Marriage of Ditto* (1988) 206 Cal.App.3d 643. *Ditto* noted there was no transcript either, but found it was the appellant's "failure to request a . . . statement [of decision]" that "result[ed] in a waiver" of the trial court's findings. (*Id.* at p. 647.)

*National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 (*WFG*) ["[W]e may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record."].)

Points raised for the first time on reply may be forfeited too. (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178 (*Raceway*) ["We generally do not consider arguments raised for the first time in a reply brief."].) Here, both parties raise new points in their reply briefs, we generally deem them forfeited, and address them only as noted herein.[5]

B.    *Temporary Support Arrears*

The judgment required Shannon to pay arrears based on application of *Ostler-Smith* percentages to her bonuses and stock options for 2019 to 2021. Shannon contends the trial court "exceeded its jurisdiction by retroactively modifying support" prior to Steven's 2021 RFO. Steven argues the court erred by not applying the *Ostler-Smith* percentages to 2018. Neither party establishes error.

1.    *Additional Facts*

a.    *Early Proceedings*

The trial court proceedings are central to our analysis, and we describe them in some detail. In May 2018, Steven filed an RFO for child and spousal support effective June 1, 2018. He sought a "reasonable percentage of [Shannon's] bonus income, to be calculated per [*Ostler-Smith*]." His supporting declaration said she earned base pay and a bonus, and "also receive[d] benefits" including stock options.

---

[5]    When we note a point is raised for the first time on reply, we mean the party did not raise the issue until the reply brief in either appeal.

Judge Braner presided over the early hearings. On September 14, 2018, the court heard Steven's RFO. Its minute order (September 2018 Minute Order) made support effective June 1, 2018 and set a review hearing for December 14, 2018. It stated in part: "Both parties enter into a [*Gruen*] waiver. [¶] The Court grants the parties['] stipulation for a vocational evaluation to be performed on [Steven]." It also stated, "Regarding Bonus Income, [Shannon] to pay 8.26% towards child support and 25.50% towards spousal support. ([*Ostler-*]*Smith*)." Finally, the court directed Steven to prepare the findings and order after hearing (FOAH).

In November 2018, Shannon lodged Steven's vocational evaluation. It found he had an active California bar license, and an earning capacity of approximately $95,000 to $120,000.

In the minute order for the December 14, 2018 hearing (December 2018 Minute Order), the trial court "note[d] this matter was . . . set for purpose of the [v]ocational [e]valuation," imputed income to Steven of $105,000, and modified base support. It also noted his counsel was "requesting no changes to be made" to current orders. The order said "existing orders remain in effect, pending further hearing, except where in conflict, this order controls" (capitalization omitted), and again directed Steven to prepare the FOAH.

In January 2019, the case was reassigned to Judge McLaughlin. In March 2019, Shannon filed an RFO to modify support, because Steven "started consulting as a general counsel" in February.

On August 22, 2019, the trial court entered the FOAH for the September 2018 hearing (2019 FOAH). It stated the "parties agree that the [c]ourt will retain jurisdiction to make retroactive modification of the support order at the next hearing." That said, it appeared to encompass the

8

December 2018 hearing too, including by noting the income imputation. It did not expressly discuss Shannon's bonus, stock options, or *Ostler-Smith*.

The trial court issued rulings on Shannon's RFO and other requests in ex parte minutes dated September 9, 2019. It set guideline child support based on Steven's actual earnings back to February 2019, and reduced spousal support effective July 2019. The court denied Steven's "request to include cash bonus . . . in income used for support . . . either retroactively or prospectively," stating: "Such income will continue to be subject to an [*Ostler-Smith*] calculation as bonus income." It also denied his request to include Shannon's "stock option bonus pay as income, without prejudice," noting she was arguing the options were assets.

Steven moved for reconsideration, arguing the trial court could not modify support before Shannon's RFO. In supplemental filings, he said the parties agreed on that issue, but disagreed as to, inter alia, the "language for dealing with [Shannon's] bonus and stock option income . . . and *Ostler-Smith* language."

b.      *June 22, 2020 Hearing and FOAH*

On June 22, 2020, the trial court heard Steven's motion to reconsider, and ruled its support jurisdiction extended to the filing of Shannon's RFO. The court also confirmed Steven was "request[ing] . . . the [*Ostler-Smith*] calculation as it applies to bonuses," said it "will make that order as well," and "reserv[ed] on the bonus already received" for trial.

On August 17, 2020, the trial court entered a FOAH for the June 22, 2020 hearing, which said it was correcting its September 2019 minute order (2020 FOAH). The court "adopt[ed] . . . [*Ostler-Smith*] percentages presented" by Steven, and stated, "Going forward, child support shall be 10.42% of [Shannon's] gross bonus, and spousal support shall be 14.82% of

9

[her] gross bonus. The court does not make orders to divide the bonuses already paid or allocate payment at this time and reserves those issues for trial." It did not address stock options.

c. *Steven's RFOs Regarding Retroactivity*

Meanwhile, on July 31, 2020, Steven filed an RFO after he lost his consulting work, to "preserve the [c]ourt's ability to make support . . . orders retroactive" to August 2020 at trial. He said he was "not waiving any other support claims over which the [c]ourt has reserved jurisdiction," including "bonus and stock option sales and the impact on support." In November 2020, Steven asked to take the RFO off calendar, stating it was "only to preserve retroactivity pending trial and does not require a hearing . . . ."

On June 23, 2021, Steven filed an RFO for the trial court to find it reserved jurisdiction to make support orders back to June 1, 2018. Shannon argued the only reservation was for the vocational evaluation in September 2018, and she "relied upon that fact" for tax, investment, and other purposes. The trial court ruled Steven's RFO would be heard at trial.

d. *October 12, 2021 Hearing and Order*

At a pretrial hearing on October 12, 2021, the trial court addressed Steven's requests for a "retroactive date for . . . support," and to "include wife's bonus compensation in cash, stocks, or vested stock options . . . as income available for support." The court noted it "made a bonus income order" in September 2018, and the December 2018 minute order "reflected that existing orders" remained in effect. The court also noted its September 2019 ex parte minute order said the cash bonus "would continue to be subject to an [*Ostler-Smith*] calculation . . . ."

In its order, the trial court ruled the "only clear and expressed reservation" for retroactivity was for the vocational evaluation. However, it

10

"set retroactive for modification to July 31, 2020 when [Steven] filed his [RFO] to modify support," citing equity and a lack of clarity around its withdrawal in light of trial. The court also ruled that bonus income was "not to be considered regular income available for support," and Steven's stock option request was previously denied without prejudice and he could address it at trial.

### e. *Trial, Statement of Decision, and Judgment*

Trial commenced the following week before Judge Garcia. The trial court stated it was "inclined to accept Judge McLaughlin's ruling" that support jurisdiction was retroactive to July 31, 2020, noting she "made a ruling if not based in law, based on equity . . . ."

At the end of trial, the trial court ruled it would not "retroactive[ly] modif[y] . . . basic support . . . back to July 2020," as Steven had requested, but it would "make [*Ostler-Smith*] orders back to July 2020" and had to determine if it had jurisdiction for 2019.

The next day, the trial court issued its *Ostler-Smith* ruling. The court took judicial notice of the case history, and stated it was "clear to [the court] today" that Shannon's "bonuses have always been subject to [an *Ostler-Smith*] formula back to 2018." The court further stated the "issue of the options and whether they're an asset or income or both is a trial issue," and "has always been a trial issue, even if not expressly reserved"; it was clear the court previously "just did not want to address it"; and it had "authority to make orders" on it. The court applied the *Ostler-Smith* formula to the "options just as it does on bonuses because the values are not set today," and will depend on vesting and fair market value.

11

The Statement of Decision addressed the trial court's grounds for including Shannon's bonuses and stock options as income available for temporary support under *Ostler-Smith*.

First, regarding bonus income, the trial court stated:

"[Shannon's] bonuses have always been subject to [*Ostler-Smith*] orders, back to 2018, pursuant to the court's orders for temporary support. Effective June 22, 2020, the court ordered that any future bonuses received by [Shannon] would be subject to *modified* Ostler-Smith percentages of 10.42% as additional child support, and 14.82% as additional spousal support. The court reserved jurisdiction 'to divide the bonuses already paid or allocate payment' to the time of trial."

The trial court found the *Ostler-Smith* percentages ordered on June 22, 2020, to be "fair and reasonable," and applied them to calculate each year of bonus income (i.e., 2018, 2019, and 2020, paid in the following year).

Second, the trial court stated inclusion of stock options as income for support had "always been a trial issue" and it had "jurisdiction . . . to address" it. It explained that, after it found *Nelson* applied to allocate the stock options, what "remained to be addressed" was the "income they could have generated" for additional support. The court found that "[b]ecause of the variable and non-guaranteed nature of stock options," and again finding the June 2020 *Ostler-Smith* percentages to be "fair and reasonable," it was "appl[ying] those percentages to [Shannon's] income from separate property stock options." It noted "[n]either party presented sufficient evidence to determine the application of the . . . percentages to any stock option income for 2018." The court then calculated the additional support owed for 2019 to 2021.

The judgment included sections for temporary support, which set forth the *Ostler-Smith* arrears totaling $545,217.

12

## 2. *Additional Law*

### a. *Child and Spousal Support*

Statutory guidelines govern both temporary and permanent child support. (See Fam. Code, § 4050 et seq.)[6] " 'The guideline amount of child support, which is calculated by applying a mathematical formula to the relative incomes of the parents, is presumptively correct.' " (*Anna M. v. Jeffrey E.* (2017) 7 Cal.App.5th 452, 446.) The formula is based on annual gross income, which is defined as " 'income from whatever source derived . . . .' " (*Ibid.*, citing § 4058.) An *Ostler-Smith* provision is " 'an additional award, over and above guideline support," meant to "capture fluctuations in the supporting spouse's income . . . .' " (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 949 (*Minkin*).)

"California law provides for two distinct types of spousal support—temporary and permanent. . . . Whereas the latter is intended to make an equitable apportionment between the parties, the former is meant to allow a spouse to continue to live in the manner to which he or she is accustomed during the time the dissolution action is pending." (*In re Marriage of Mendoza & Cuellar* (2017) 14 Cal.App.5th 939, 942–943.) Spousal support can include an *Ostler-Smith* percentage as well. (*In Marriage of Kerr* (1999) 77 Cal.App.4th 87, 95 (*Kerr*).)

The statutory provisions governing modification of support "permit[ ] the trial court to make its ruling retroactive to the filing date of the motion, but no earlier." (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 300 (*Cheriton*) [citing § 3650 et seq.]; *Stover v. Bruntz* (2017) 12 Cal.App.5th 19,

---

6    All further statutory references are to the Family Code unless otherwise noted.

13

26 [order modifying support before motion filing would violate statute and be in "excess of . . . jurisdiction"].)

b.      *Standard of Review*

We review support awards for abuse of discretion.  (*Kerr, supra,* 77 Cal.App.4th at pp. 93, 97.)

Whether a court had jurisdiction to modify a support order is a legal question, subject to de novo review.  (*In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 637 (*Gruen*).)

The "meaning of a court order" is also a "question of law within the ambit of the appellate court."  (*In re Ins. Installment Fee Cases* (2012) 211 Cal.App.4th 1395, 1429 (*Installment Fee Cases*) [" 'In construing orders they must always be considered in their entirety, and the same rules of interpretation will apply in ascertaining the meaning of a court's order as in ascertaining the meaning of any other writing.' "]; see *Dow v. Lassen Irrigation Co.* (2022) 79 Cal.App.5th 308, 326 (*Dow*) [if a writing is " 'capable of more than one reasonable interpretation, it is ambiguous' "].)

3.      *Analysis*

a.      *Shannon Does Not Establish The Trial Court Lacked Jurisdiction for The* Ostler-Smith *Arrears*

Shannon argues the trial court erred by "retroactively modif[ying] child and spousal support orders . . . from 2019 to 2021 despite lacking reserved jurisdiction to do so."  The arrears were based on the *Ostler-Smith*

14

percentages; the court determined it had jurisdiction to award them; and Shannon does not establish this was error.[7]

In awarding the *Ostler-Smith* arrears, the trial court found Shannon's bonuses were "always . . . subject to [*Ostler-Smith*] orders" pursuant to the court's 2018 temporary support orders, and the inclusion of stock options as income for support had "always been a trial issue. . . ." Essentially, the court determined it had jurisdiction to award *Ostler-Smith* arrears, based on existing orders. Viewing the court's prior orders in light of both their language and context, we conclude this determination was sound.

The September 2018 Minute Order granted Steven's request for *Ostler-Smith* percentages on Shannon's bonus income, and also indicated the parties entered a *Gruen* waiver and Steven would undergo a vocational evaluation. The December 2018 Minute Order imputed income based on the evaluation and reduced base support. By also stating "existing orders remain in effect[ ]," the order impliedly referred to something else—like the *Ostler-Smith* percentages. That reference would be consistent with the order's statement that Steven's counsel was requesting no changes.

The 2019 FOAH, which covered both hearings, addressed base support (noting the parties agreed the court "retained jurisdiction to make retroactive modification of the support order at the next hearing"), but not *Ostler-Smith*. However, given one underlying minute order set *Ostler-Smith* percentages, the other one let them remain, and subsequent pretrial orders assumed they

---

[7] There was also a small arrears amount for an underpayment, which is not at issue. Both parties also address the October 12, 2021 order, which set the July 2020 retroactive jurisdiction date. Because our focus is on *Ostler-Smith*, the trial court found *Ostler-Smith* jurisdiction on other grounds, and it declined to actually modify base support back to July 2020 anyway, we need not and do not address the propriety of that order.

were in place, the most reasonable interpretation—if not the only one—is that the court's silence was an inadvertent omission. (See *Installment Fee Cases*, *supra*, 211 Cal.App.4th at pp. 1429–1430 [" 'If the language of the order be in any degree uncertain, then reference may be had to the circumstances surrounding, and the court's intention in the making of the same.' "]; cf. *Gribaldo, et al. v. Agrippina Versicherunges A.* (1970) 3 Cal.3d 434, 446, fn. 8 [memorandum decision could be used to "discover[ ] the process by which the trial judge arrived at his conclusions"]; *Dahlin v. Moon* (1956) 141 Cal.App.2d 1, 4 [court "could use [the minute order and oral statements] to find the basis of the court's decision"].)

We elaborate on those subsequent orders. When the trial court ruled on Shannon's support modification RFO on September 9, 2019—just weeks after entering the 2019 FOAH on August 22, 2019—it said her cash bonus will "continue to be subject to an *Ostler-Smith* calculation." This statement only makes sense if the 2019 FOAH encompassed *Ostler-Smith* percentages. Then, in the court's 2020 FOAH, it said it was correcting the September 9, 2019 minute order, but did not change *Ostler-Smith* language. Rather, the court said it was reserving division and allocation of already-paid bonuses for trial, and set *Ostler-Smith* percentages "[g]oing forward . . . ." The court did not disclaim the existence of the *Ostler-Smith* percentages at the October 12 hearing, either.

Put simply, *at no point* after imposing *Ostler-Smith* percentages did the trial court suggest it did not mean to do so, and *everything* suggests its 2019 FOAH simply omitted this obligation. Thus, when the court set *Ostler-Smith* arrears after trial, it could properly conclude it was calculating the payments owed for an existing obligation, not retroactively modifying support.

Shannon's arguments do not persuade us to reach a different result.

16

First, Shannon argues the trial court's silence in the 2019 FOAH reflects it denied an *Ostler-Smith* award, making its later imposition a retroactive modification. She relatedly argues any *Ostler-Smith* language in the September 2018 Minute Order conflicts with the FOAH, and the FOAH must control, citing *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139. (*Id.* at p. 1170 ["when the . . . minute order expressly indicates that a written order will be filed, only the written order is the effective order"].) *Drake* does not help Shannon. The fact that the 2019 FOAH was the operative order does not resolve the question of what it *meant*. Beyond that, she essentially asks us to interpret an ambiguity in isolation, which we decline to do. (*Installment Fee Cases*, *supra*, 211 Cal.App.4th at pp. 1429–1430.)[8]

Second, Shannon argues the trial court "never expressly reserved jurisdiction over support," the only retention of jurisdiction was pursuant to the parties' *Gruen* waiver at the September 2018 hearing, and this only extended to December 2018. Steven, in contrast, argues the *Gruen* waiver was an "express reservation of jurisdiction" under *In re Marriage of Freitas* (2012) 209 Cal.App.4th 1059 (*Freitas*) that lasted through trial. We conclude neither case applies here.

"Distilled simply, *Gruen* and *Freitas* together establish the rule that a trial court lacks jurisdiction to retroactively modify a temporary support order to any date earlier than the date on which a proper pleading seeking modification of such order is filed [citation], unless the trial court expressly reserves jurisdiction to amend the support order such that the parties' clear

---

8    Having concluded omission of *Ostler-Smith* language was a mistake, we also reject Shannon's claim that Steven invited any error. (*People v. Waldon* (2023) 14 Cal.5th 288, 304 [for invited error, it " ' "must be clear that counsel acted for tactical reasons and not out of ignorance or mistake" ' "].)

expectation is the original support award is not final." (*In re Marriage of Spector* (2018) 24 Cal.App.5th 201, 210 (*Spector*).) Because the trial court's application of *Ostler-Smith* percentages was not a retroactive modification, no reservation was necessary and we need not resolve the parties' dispute.

We note that even if the trial court had impliedly denied *Ostler-Smith* percentages in the 2019 FOAH, its later orders could be viewed as correcting the FOAH to match its intended ruling. In *Spector*, the Court of Appeal held a trial court had "inherent authority to reconsider" a temporary support order, and "to apply its modified decision retroactively." (*Spector*, *supra*, 24 Cal.App.5th at p. 204.) Shannon contends *Spector* cannot apply because the court here "considered new evidence, made new findings, and conducted a new trial," before it levied the arrears. (*Id.* at pp. 213–214 [authority does not extend to " 'order[ing] a new trial' "].) She does not elaborate, and the record reflects the court relied on its prior orders both to find jurisdiction and identify the percentages for the arrears.

Third, Shannon argues on reply, without authority, that even if the trial court could enter a later *Ostler-Smith* order, it "would be limited solely to . . . bonuses, not stock options." She forfeits the point (*Raceway*, *supra*, 2 Cal.5th at p. 178; *Badie, supra*, 67 Cal.App.4th at pp. 784–785), and it is not persuasive regardless. Her contention is that while Steven's May 2018 RFO mentioned stock options, his *Ostler-Smith* request "was only for 'a reasonable percentage of her bonus income" and the September 2018 Minute Order "limit[ed] *Ostler-Smith* to 'Bonus income.' " But the issue would be what "Bonus income" *means*.

*Ostler-Smith* did involve a cash bonus. (*Ostler-Smith*, *supra*, 223 Cal.App.3d at p. 42.) However, courts have since applied percentages to other variable pay, and addressed the meaning of these provisions. (See, e.g.,

18

*In re Marriage of Samson* (2011) 197 Cal.App.4th 23, 25 ["percentage-based component of . . . stipulated order, modeled after [*Ostler-Smith*], was intended to apply to . . . commissions"]; *Kerr, supra,* 77 Cal.App.4th at pp. 95, 97 [reversing order that included "percentage of income once . . . stock options were exercised," for percentages consistent with child and spousal support standards]; *Minkin, supra*, 11 Cal.App.5th at pp. 948–953 [parties presented evidence on meaning of *Ostler-Smith* provision in stipulated judgment; record supported finding that it did not encompass equity compensation].)

Here, the September 2018 Minute Order did not define the term "Bonus income," rendering it ambiguous. (*Dow, supra,* 79 Cal.App.5th at p. 326.) One could reasonably interpret the term to encompass stock option based income—including where, as here, the party seeking support noted the existence of stock options (even if in a different part of the RFO). This interpretation is consistent with the trial court's later finding that the options were the kind of "variable and non-guaranteed" income that is properly subject to *Ostler-Smith*.

Finally, Shannon does not establish prejudice. She contends her strong opposition to Steven's 2021 RFO as to retroactivity made "clear that her expectation had been all along" that the *Ostler-Smith* issue was "final" in 2018 (i.e., denied in the 2019 FOAH), and the arrears were "unexpected and unduly burdensome." She also notes alleged concessions by Steven that the matter was settled, but subject to modification (even claiming they support forfeiture of his position on appeal). We already rejected her view of the *Ostler-Smith* rulings, and the record shows she should have known, at minimum, that Steven continued to seek *Ostler-Smith* amounts—foreclosing any surprise. For example, in his July 2020 RFO, he said he was not waiving

19

any claim to bonus or stock option income (and he did not retract this statement when he took the RFO off calendar as unnecessary).

Shannon further argues her "attorney reiterated the prejudice" of the arrears, as they imposed an "expectation of having to sell stock options to pay additional support nearly three years after the sales should have taken place." Counsel argument is "not evidence" (*Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1173 (*Fuller*)), and she cites nothing in the record showing she had to sell the options or that selling now, as opposed to earlier, was detrimental to her.[9]

### b. *Steven Does Not Show The Trial Court Erred By Not Awarding Additional* Ostler-Smith *Arrears*

Steven argues the trial court "erred in failing to grant [*Ostler-Smith* arrears] back to June 1, 2018" at the October 12, 2021 hearing, citing the effective date in the September 2018 Minute Order. The trial court made its *Ostler-Smith* rulings at trial, and Steven fails to show the court erred by not awarding additional arrears.

The trial court found it had jurisdiction to award the *Ostler-Smith* percentages, but having *jurisdiction to award support* is not the same as *awarding support*. We review support awards for abuse of discretion (*Kerr*, *supra*, 77 Cal.App.4th at pp. 93, 97), and Steven does not show the court abused its discretion. On stock options, the court found there was insufficient evidence to apportion them for 2018, and the record supports this finding (see *post*). On the cash bonus, Steven received *Ostler-Smith* arrears based on the 2018 bonus, paid in 2019. He does not address the 2017 bonus paid in 2018,

---

9    She makes a similar point regarding "compelled . . . exercise," in her spousal support discussion, and again cites no record evidence.

20

much less show any exclusion was unreasonable, and forfeits the point. (*Badie*, *supra*, 67 Cal.App.4th at pp. 784–785.)

C.     *Denial of Trial Continuance*

Shannon argues the trial court's denial of her continuance request was reversible error, because it prevented her from presenting material evidence and having a fair trial.  We disagree.

1.     *Additional Facts*

The trial court made its ruling regarding the July 31, 2020 retroactive jurisdiction date at the outset of the October 12, 2021 hearing.  The court then addressed discovery issues, including a request by Steven to open discovery.  Shannon's counsel successfully opposed the request, stating in part that "trial begins in three business days" and they did not "want any way for Steven to come into trial . . . and ask for a continuance because he still needs to do discovery."

On the second day of trial, the trial court confirmed it had jurisdiction retroactive to July 31, 2020.  Shannon's counsel requested a continuance on retroactive support, stating Shannon was unaware this would be an issue until October 12 and it was a surprise.  The court said its ruling was that it "ha[d] jurisdiction," and it had not "determined whether [it] would make the order retroactive."  Shannon's counsel made an offer of proof, stating she "guess[ed]" Steven was "going to request that [the] imputation be changed," she lacked evidence on what the "imputation should be" since July 2020, and would have wanted to "argue[ ] at the time for a cap . . . ."

The trial court denied the continuance request, stating:  "It's not really part of this trial. . . . If you think you have an appellate issue, you can certainly appeal."  The court explained, "[J]udge [M]cLaughlin has already

21

ruled on this issue.  The idea that . . . you weren't on notice and . . . or didn't have time to finish your discovery, that issue was to be argued at that time."

Shannon gave testimony consistent with the offer of proof, and her counsel further argued that with a continuance, she would have "offered an expert relating to retroactive income available for support."  Steven's counsel stipulated that "there are other jobs in the San Diego area that pay more than what [Steven] currently makes and more than he was imputed," which the trial court accepted.

In the Statement of Decision, the trial court addressed Shannon's request for an explanation of why it denied her continuance request, despite her offer of proof.  The court stated it "denied [Shannon's] request to continue the trial as untimely; the parties had already submitted the matter to the court for decision and the court was in the process of giving its decision."

2.    *Additional Law*

Rule 3.1332 of the California Rules of Court, which governs motions to continue trial, states that "[t]o ensure the prompt disposition of civil cases, the dates assigned for a trial are firm."  (Rule 3.1332(a).)[10]  Under this rule, continuances are "disfavored" (rule 3.1332(c)) and "granted only on an affirmative showing of good cause requiring a continuance."  (*Falcone, supra,* 164 Cal.App.4th at p. 823.)  "Circumstances that may indicate good cause" include a "party's excused inability to obtain essential testimony, documents, or other material evidence despite diligent efforts."  (Rule 3.1332(c)(6).)  The court must also "consider all the facts and circumstances that are relevant to the determination," including whether there "was any previous continuance, extension of time, or delay of trial due to any party[.]"  (Rule 3.1332(d)(2).)

---

10    All further references to rules are to the California Rules of Court.

"A motion for continuance is addressed to the sound discretion of the trial court." (*Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389, 1395.) An "abuse of discretion results in reversible error only when the denial of a continuance results in the denial of a fair hearing, or otherwise prejudices a party." (*Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 527 (*Freeman*).)

3.    *Analysis*

The trial court denied Shannon's continuance request because it was untimely, elaborating at trial that the retroactivity issue was addressed at the October 12, 2021 hearing and she could have raised her notice and discovery issues there.

Although Shannon notes in her factual background that the trial court rejected her continuance request as untimely, her argument section simply asserts she alerted the court she "was not fully prepared to present evidence of Steven's income from 2020 to 2021" and instead of considering her request in good faith, the court told her she could appeal. Because Shannon omits any reasoned argument on the court's actual ruling, we deem the issue forfeited. (*Badie*, *supra*, 67 Cal.App.4th at p. 784.)

We do not discern any abuse of discretion regardless. By the October 12, 2021 hearing at which the trial court ruled on the retroactive jurisdiction date, trial had been continued four times. (Rule 3.1332(d)(2) [relevant factors include prior continuances].) Further, Shannon does not contend or show she notified the court at the time that she needed more time and evidence due to that ruling. Indeed, it appears she opposed Steven's request to reopen discovery to *avoid* further delays. The court could fairly reject her continuance request at trial as untimely.

The arguments Shannon does offer lack merit.

23

First, Shannon maintains the July 2020 retroactivity ruling at the October 12, 2021 hearing was a "complete surprise." Even if she were surprised, she could have sought a continuance to reopen discovery at that hearing (or at least refrained from opposing Steven's request).

Second, Shannon argues the trial court "noted in its statement of decision that 'neither party presented sufficient evidence' to fully determine the parties' post-separation income," which was "exactly [her] point" when she sought the continuance. That is not what the court said. It was addressing application of the *Ostler-Smith* percentages to stock options, and stated, "Neither party presented sufficient evidence to determine the application of the [*Ostler-Smith*] percentages to any stock option income for 2018." This finding was favorable to Shannon, and unrelated to the July 2020 retroactivity date or continuance issue.

Finally, Shannon does not show prejudice, much less per se error. (*Freeman*, *supra*, 192 Cal.App.4th at p. 527.) She argues the retroactivity ruling meant an additional two-year period was at issue; she would have sought evidence on Steven's actual and imputed income for 2020 and 2021; and the continuance ruling "denied [her] right to offer relevant . . . evidence on these material issues." The ruling did not impact the *Ostler-Smith* arrears, so we question this assertion of materiality. Even assuming she wanted additional evidence to seek a retroactive reduction, she does not explain why Steven's stipulation (i.e. that he could have earned a higher income) was insufficient to do so. *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, cited by Shannon here, is distinguishable. (*Id*. at pp. 668, 677 [after concluding evidentiary rulings were abuse of discretion, finding trial court "effectively excluded any presentation of evidence on liability," supporting reversal per se].)

On reply, Shannon does address *Ostler-Smith*, contending this part of the judgment essentially set retroactivity to 2019, "open[ing] a pandora's box of additional evidentiary issues" as to income available for support. The argument is too late (*Raceway*, *supra*, 2 Cal.5th at p. 178), and unpersuasive. The *Ostler-Smith* arrears were not a retroactive modification and, regardless, Shannon fails to specify any evidentiary issue she would have pursued that could have limited them.

D.    *Scope of Spousal Support*

Shannon argues the trial court's inclusion of post-separation bonuses and stock options in spousal support did not reflect the marital standard of living (at times, MSOL). Steven argues the court erred by inadequately setting, capping, and imposing a termination date on spousal support. We are not persuaded by these arguments.

1.    *Additional Facts*

By the time of trial, Steven was 57, and Shannon was 44. Shortly before trial, Steven started a full-time, nonattorney job at the University of California, Berkeley, with a salary of $130,000.

At trial, Arena's human resources business partner Kate Scanlon testified their compensation package consisted of base pay, bonus, and equity, which included stock options and RSU/PRSUs.

Shannon testified that for most of the marriage, they lived in a "condo in La Jolla near the beach." They had three vehicles: two SUVs, and a minivan for their nanny, whom they had employed until earlier that year. They mainly traveled to see family in the Midwest. Shannon guessed their average combined income in the last four years of marriage was "somewhere around 375,000 . . . [to] 400,000" gross. She said Steven "managed [their] finances," and she understood they spent most earnings to "cover expenses or

25

pay[ ] down debt" (including student loans), but "weren't accruing more debt." She said they "didn't have substantial savings until the end of the marriage," and that was largely due to the "bonus a couple months before [the marital] separation."

Shannon testified she received bonuses based on a percentage of income from 2016 to 2019 (each paid the next year). The judgment showed she also paid *Ostler-Smith* amounts on a 2020 bonus. As for stock options, she said they did not sell stock during the marriage, other than some discounted stock through an employee stock purchase plan. When asked if stock options were a "big part of [her] compensation," she said "[n]ot until the very end . . . . they didn't have value during most of the marriage." She denied considering the stock options as "savings[.]"

Steven testified that, in light of their age difference, they "developed a plan for how [they] could obtain positive financial status" that accounted for Shannon's career opportunities and early retirement for him. The plan "include[d] a discussion of stock options, of bonus income later." He further testified her stock options were an "active conversation over the years," and also that "from 2016" onward, they relied on her bonus and that "money made a huge difference to us." Steven explained they "never held onto significant savings in the past," but when he lost his job in 2017, they "started holding money in savings instead of continuing to pay down additional debt."

The trial court made applicable findings under section 4320, including as to the marital standard of living. It began by summarizing the parties' demographics and lifestyle, and noted the "marriage was just barely [one] of long duration." It found they "did not traditionally save during the marriage until the very end and maybe because there was not yet a lot of money,"

noting Shannon's "greater earning power has come in the last four years or so." The court concluded, "Based on the above factors, the [c]ourt finds the parties had an upper middle-class standard of living based on where they lived and how they lived and the fact that they didn't incur debt, other than the student loan debt."

The trial court set base spousal support at $1,000 per month, plus an *Ostler-Smith* percentage. It imposed a $35,000 annual cap on total spousal support, explaining Steven's net disposable income, child and spousal support, and *Ostler-Smith* award will "more than adequately allow him to sustain the marital standard of living . . . ." It noted the parties incurred "somewhere between $9[,000] to $13,000 a month" to maintain that standard of living. The court also determined spousal support would terminate on September 30, 2023, "unless extended by a court order on a showing . . . of good cause," in a "motion filed on or before the date set for termination."

2. *Additional Law*

Section 4330 "authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320." (*Nelson, supra*, 139 Cal.App.4th at p. 1559.)

Section 4320 sets forth a number of circumstances relevant to setting spousal support, including the extent to which each party's earning capacity is sufficient to maintain the "standard of living established during the marriage" (taking into account, inter alia, marketable skills) (*id.*, subd. (a)); the extent to which the supported party contributed to the supporting party's education and career (*id.*, subd. (b)); the supporting party's ability to pay (*id.*, subd. (c)); each party's needs based on the marital standard of living (*id.*,

27

subd. (d)); each party's assets and obligations (*id.,* subd. (e)); marital duration (*id.,* subd. (f)); age and health of the parties (*id.,* subd. (h)); the balance of hardships (*id.,* subd. (k)); the "goal that the supported party shall be self-supporting within a reasonable period of time" (*id.,* subd. (*l*)), and any other factors the court deems "just and equitable" (*id.,* subd. (n)).

The marital standard of living is a "general description of the station in life the parties had achieved by the date of separation," which is "satisfied by the everyday understanding of the term in its ordinary sense, i.e., upper, middle or lower income." (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 491.) It is "not . . . a mathematical standard." (*Id.* at p. 491; *Nelson, supra,* 139 Cal.App.4th at p. 1560 [" '[m]arital standard of living' is merely a threshold or reference point against which all of the statutory factors may be weighed."].)

"The trial court has broad discretion [under section 4320] in balancing the applicable statutory factors and determining the appropriate weight to accord to each, but it may not be arbitrary and must both recognize and apply each applicable factor." (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 207.)

As noted, we review a spousal support award for abuse of discretion. (*Kerr, supra,* 77 Cal.App.4th at p. 93.) Further, because neither party requested a statement of decision on the spousal support issues raised here, we infer the trial court made all necessary findings for its decision. (*Fladeboe, supra,* 150 Cal.App.4th at p. 58.)

3. *Shannon's Argument: Inclusion of Post-Separation Bonuses and Stock Options As Income for Support*

Shannon argues the trial court erred by including her "post-separation receipt of bonuses or stock options" in spousal support, both prospectively and retrospectively. She establishes no error.

28

First, Shannon contends the trial court failed to "consider whether [her] post-separation receipt of bonuses or stock substantially exceeded the parties' standard of living," emphasis omitted, citing the absence of a finding that this income was consistent with the standard of living. In addressing the marital standard of living, the court noted there was "not yet a lot of . . . money" until the end and her "greater earning power" was in the last few years—reflecting it *did* consider the couple's evolving financial status. Further, the marital standard of living is a "reference point" for spousal support, "neither a floor, nor a ceiling . . . ." (*Nelson*, *supra*, 139 Cal.App.4th at p. 1560.) The trial court could include bonus and stock option income based on other section 4320 factors, including Steven's age and lack of recent legal practice, and Shannon's ability to pay. (§ 4320, subd. (h) [age and health]; *id.*, subd. (a)(1) [marketable skills]; *id.,* subd. (c) [supporting party's ability to pay]; *Cheriton*, *supra*, 92 Cal.App.4th at p. 308 ["Unquestionably, where the supporting party has the ability to pay, a trial court has discretion to award spousal support at a level above the actual marital standard of living."].)

Second, Shannon suggests there was no evidence for including postseparation bonus and stock option income. We disagree. The court could credit Steven's testimony that her bonuses and stock options were important to their financial planning during the marriage—particularly given Shannon's acknowledgment that he handled their finances. Shannon does not show otherwise. She cites the trial court's finding that there was "not yet a lot of . . . money" during the marriage, the purported inconsistency of her bonuses, and the lack of stock exercises and sales during marriage (and subsequent increase in their value). But the court found they did start saving money at the end of the marriage. On the bonuses, she acknowledged

she received one each year, and the court elsewhere found that the "fact that [she] might not have received it . . . does not negate" that she "did receive it." As for the stock options, the court did not have to believe her claim that they were unimportant, just because the stock remained unsold during marriage and increased in value later (a claim that disregards the value of having access to future equity income). (Cf. *Kerr*, *supra*, 77 Cal.App.4th at p. 94 [parties' "standard of living based on the use of their options had permitted them to improve that standard, to save money and invest wisely, and thereby increase their wealth"].)

Finally, Shannon's reliance on *Kerr* is misplaced. There, the Court of Appeal reversed a spousal support award that included 25 percent of future stock option income, where the stock value increased twentyfold over three years. (*Kerr*, *supra*, 77 Cal.App.4th at p. 92.) The court concluded the increase was a "unique circumstance[ ]," and spousal support would "far exceed the parties' standard of living . . . ." (*Id.* at pp. 90, 95.) But the court also said that, on remand, an award on "exercised option income would be permissible as long as the court sets a maximum amount proportionate" to the marital standard of living. (*Id.* at p. 95.) Shannon identifies no comparable unique circumstances, and the trial court *already* set both a cap and termination date (properly, as we discuss *post*).

4. *Steven's Arguments*

a. *Inadequate Support*

Steven contends the spousal support amount is "marginal and not adequate," based on claimed monthly expenses of $11,025 and income of $10,684 (from his estimated net salary, and base support). He cites other concerns too, including student loans, a loan to his sister, and credit card debt; the need for a nanny, a new car, and retirement contributions; and the

"insecurity of his new job." He also speculates Shannon may resist payment. We are not persuaded.

Steven had a full opportunity to present his evidence to the trial court, and we presume the court considered it to the extent relevant. (*Fladeboe*, *supra*, 150 Cal.App.4th at p. 58; cf. Evid. Code, § 664 [presumption that official duties have been performed].) The court was not required to accept his view of his expenses, income, or the precarity of his job. (Cf. *In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 160 [where trial court clearly disbelieved husband's claim that he lacked "means to pay the sums ordered," its credibility assessment was "binding"].) Nor was the court compelled to prioritize Steven's alleged expenses; rather, the court had to consider all section 4320 factors. (*In re Marriage of Fransen* (1983) 142 Cal.App.3d 419, 425 ["trial court must not limit itself to an award based entirely upon need"].) Further, Steven's counsel had stipulated he could be earning more, which the court could take into consideration.

b.　*Annual Cap*

Steven argues that in setting an annual cap on spousal support, the trial court both "appl[ied] the wrong standard," by focusing on expenses during the marriage, and abused its discretion by not accounting for the couple's upward mobility and letting Shannon manipulate support. These arguments lack merit.

We begin with Steven's legal error argument. He contends his needs must be judged in terms of the couple's "station in life," and this standard was "not satisfied" by the trial court's finding that their monthly expenses to maintain the standard of living were $9,000 to $13,000. There is no dispute the court had to consider the marital standard of living, or "station in life," in

31

setting spousal support, including with respect to need. (§ 4320, subd. (d) [party needs, based on marital standard of living]; *Smith, supra,* 225 Cal.App.3d at p. 475 [describing marital standard of living as "station in life"].) But the court did consider the marital standard of living, as discussed above. It was while setting the cap that the court *additionally* noted the monthly expenses. And the court reasonably explained why it was imposing the cap: his other resources "more than adequately allow[ed] him to sustain the marital standard of living . . . ."[11]

Steven also cites *Macilwaine*, where the reviewing court reversed a child support cap imposed under the wrong standard. (*Macilwaine, supra,* 26 Cal.App.5th at p. 537 [rejecting cap based on father's current level of support, not attainable level].) Spousal support involves different considerations than child support (*Blazer, supra,* 176 Cal.App.4th at p. 1446, fn. 3), and he has not shown the trial court used an incorrect standard here.

We now turn to Steven's attempts to establish an abuse of discretion.

First, he argues an "upwardly mobile lifestyle is like a form of savings for the future," and the trial court's imposition of the cap "discarded the [couple's] upward mobility . . . ." Steven did testify the couple relied on Shannon's bonuses and stock options for financial planning, but that is not the same as asserting they were "upwardly mobile" for "savings" purposes—a claim he did not make at trial. He cannot fault the trial court for failing to consider it. (See, e.g., *In re Marriage of Weinstein* (1991) 4 Cal.App.4th 555,

_____

11    Steven acknowledges this explanation in passing, including when he describes inclusion of the *Ostler-Smith* award in his resources as "double-dipping." He offers no reasoned argument or authority, and forfeits any challenge in this regard. (*Badie, supra,* 67 Cal.App.4th at pp. 784–785.)

567 [appellant precluded from arguing spousal support did not account for inflation, where she did not raise the issue below].)

Steven relies on multiple cases to argue that courts must consider if the standard of living was artificially low or high, including in light of savings (e.g., *In re Marriage of Drapeau* (2001) 93 Cal.App.4th 1086, 1096–1098), and cannot leave one spouse at a "significantly lower plateau of living" (*Ostler-Smith, supra*, 223 Cal.App.3d at p. 48). But, again, he did not argue they were upwardly mobile, much less living below their means; the court did address the marital standard of living, including the parties' evolving financial status; and it found Steven could sustain that standard. The cases are also distinguishable. (*Drapeau*, at pp. 1096–1098 [remanding where there was evidence of significant savings, and it was unclear if trial court considered it]; *Smith, supra*, 225 Cal.App.3d at p. 485 [where husband worked unreasonable hours and parties lived beyond their means, marital standard of living had "reduced significance"]; *Ostler-Smith*, at pp. 38, 48 [wife testified that bank executive husband described their standard of living as one of upward mobility, but trial court gave "little or no weight to the upward mobility of the family"].)

Second, Steven argues the $35,000 annual cap lets Shannon "postpone sales" of options and RSU/PRSUs to her advantage, she could also "influence management as to when best to award her options," and the trial court "erred in failing to safeguard" against such manipulation. He provides no record citations for this speculation, nor does he explain how such manipulation would actually work (especially given that the *Ostler-Smith* percentages apply at vesting), and we would reject the point even if not forfeited. (*WFG, supra,* 51 Cal.App.5th at p. 894.)

Steven raises two additional points here. He argues it is unfair for Shannon alone to benefit from their lifestyle, but the trial court was not required to equalize their postseparation living standards. (See *Weinstein*, *supra*, 4 Cal.App.4th at p. 568 [if "the supported spouse receives an amount sufficient to maintain" the marital standard of living, the "fact that postseparation earnings allow the supporting spouse to maintain a higher one does not invalidate the award"].) He also argues he was "deprived of *Ostler-Smith* arrearages, attorney fees, debt payments, and real estate opportunities." His view that he should have received arrears and fees sooner does not support an abuse of discretion in connection with ongoing spousal support.

c.     *Termination Date*

Finally, Steven argues the trial court erred by setting a termination date of September 30, 2023, without reserving jurisdiction, because this was a "statutory long-term marriage" and support would only be five years (from the September 2018 Minute Order) or under two years (from trial). He does not establish any abuse of discretion.

Section 4320, subdivision (*l*) sets forth a "goal that the supported party shall be self-supporting within a reasonable period of time," and states that except in a marriage of long duration (i.e., 10 years), a " 'reasonable period of time' . . . generally shall be one-half the length of the marriage." The section further states, "However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties." Section 4336 provides that absent party agreement or a court order terminating support, a court "retains jurisdiction indefinitely" in a dissolution proceeding for a long marriage. Thus, a trial

34

court retains discretion to order a termination date even in marriages of long duration, under appropriate circumstances.

In *In re Marriage of Morrison* (1978) 20 Cal.3d 437 (*Morrison*), the California Supreme Court held a "trial court should not terminate jurisdiction to extend a future support order after a lengthy marriage, unless the record clearly indicates that the supported spouse will be able to adequately meet his or her financial needs" at the time of termination. (*Id.* at p. 453.) Although the Court reversed under the circumstances there, it stated "these standards will not require a trial court to retain jurisdiction in every case," noting the record may show "both spouses are employed" or "there are sufficient assets . . . to enable each to provide for his or her needs." (*Ibid.* ["In that event, no support or support for only a limited time, without a retention of jurisdiction, would be appropriate."].) Further, a trial court has "broad discretion in determining the meaning of 'self-supporting' in any particular case." (*In re Marriage of Shaughnessy* (2006) 139 Cal.App.4th 1225, 1237 (*Shaughnessy*).)

Here, after finding this was "just barely" a marriage of long duration and Steven was able to sustain the marital standard of living, the trial court ordered spousal support would "terminate absolutely on . . . September 30, 2023" unless Steven established good cause to extend it. The court thus impliedly found Steven would be self-supporting by that time, and exercised its discretion to set a termination date by order.

First, Steven summarily asserts the record "does not clearly indicate" he will be self-supporting by the termination date, as required by *Morrison*. His failure to describe the record is fatal to his argument, and we would reject it anyway. In *Morrison*, there was "no showing" the wife would be

35

self-supporting by the termination date, where, inter alia, she had "no significant job skills or work history" and had secured "only relatively low paying part-time" work. (*Morrison*, *supra*, 20 Cal.3d at p. 454.) The Court still recognized that when, as here, both parties are employed and have assets, retaining support jurisdiction could be inappropriate. (*Id.* at p. 453.) And Steven has full-time employment (plus a law degree and extensive work history) and other resources. (See *Shaughnessy*, *supra*, 139 Cal.App.4th at p. 1247 [trial court could reasonably conclude wife with earning capacity, funds from her parents, and other assets could and should become self-supporting].)

Second, Steven cites a treatise for the proposition that "orders fixing a non-modifiable absolute date for the termination of spousal support are 'disfavored,' " which cites *Morrison* and other cases. (See Cal. Practice Guide. Family Law, Sec. 6:1006, citing *Morrison*, *supra*, 20 Cal.3d at p. 453, *Marriage of Vomacka* (1984) 36 Cal.3d 459, 467, et al.) Steven does not elaborate on the cases, but the legal point is neither in dispute, not helpful to our analysis. The trial court impliedly found that presumption did not apply, the issue is whether Steven has established this was an abuse of discretion, and he has not.[12]

E.    *Equity Award Treatment*

Shannon argues the trial court erred by not including Steven's stock options as income available for support, and disregarding her alleged inability to sell stock. Steven asserts the court erred in multiple ways: by using the *Nelson* method to allocate stock options; disregarding the 2018

---

[12]    In the conclusion of his reply brief, Steven summarily contends we should find his "spousal support has not expired during the appeal, since it was subject to appeal." The point is forfeited.

stock options; improperly addressing "exercised stock-options from sales" (capitalization omitted); and using net values for the RSU/PRSU portion of the arrears. We conclude the RSU/PRSU issue is moot, and the remaining issues lack merit.

1. *Additional Facts*

Van Clief, the parties' joint stock option expert, and Kaseno, Steven's income expert, each prepared a report and testified at trial. Van Clief's report supplied calculations for allocating the community interest in stock options awarded prior to separation and vesting afterwards, under *Hug* and *Nelson* (cases addressing allocation). She also testified that as part of her work, she interviewed the parties, learned they had exercised options since separation, and "had an agreement on who should be charged" with receipt. For example, there were times they would exercise Shannon's options and "take the resulting cash and split it . . . ." If Steven wanted to exercise options, he could ask Shannon to do so, and he would "receive all the resulting cash . . . ."

Kaseno prepared an analysis of Shannon's monthly income available for support from 2019 to 2021, based on wages, bonus income, and vested stock options, using both *Hug* and *Nelson*. She used Van Clief's report, as well as calculations for stock options awarded to Shannon postseparation and RSU/PRSUs (which were all postseparation). Kaseno's report also had calculations that she did not include in the monthly totals. Pertinent here, Schedule 1-B showed income based on stock sales in 2019 and 2020 (due to gains in value between vesting and sale); it noted there were no sales in 2021.

At trial, Kaseno elaborated on certain parts of the report. She did not include previously vested shares that Shannon "sold . . . during this time period," stating "it would have yielded more income," but they

37

"just . . . didn't do that calculation."  She also said Steven "would also have income attributable to him for . . . stock options" from the community property attribution, but she was not asked to calculate that.[13]

The trial court also heard testimony from Arena representative Scanlon and the parties, some of which we describe *post*, and issued several rulings. For allocation of the stock options, the court used *Nelson*.  For support, the court determined, inter alia, that it would not consider Steven's options; lacked information to award *Ostler-Smith* arrears on Shannon's 2018 options; and, in light of the *Macilwaine* case, had to include the stock sale gains from Kaseno's Schedule 1-B in the arrears.

    2.    *Shannon's Arguments*

        a.    *Steven's Stock Option Income*

Shannon argues the trial court abused its discretion by failing to consider Steven's stock option income for purposes of support, when it did include Shannon's stock option income.  We disagree.

Additional legal and factual context is helpful.  In *Macilwaine*, the Court of Appeal held that income for child support purposes "includes all compensation . . . available to a supporting parent . . . ." (*Macilwaine*, *supra*, 26 Cal.App.5th at p. 532.)  Thus, "once there are no legal restrictions on the employee-parent's ability to exercise stock options and sell his or her shares, the options must be counted as 'income' " for child support.  (*Ibid*.)  Further, "any proceeds from the sale of stock constitute 'income available for support . . . .' " (*Cheriton*, *supra*, 92 Cal.App.4th at p. 288.)

---

[13]    Shannon claims "Kaseno's opinion was all of both parties' stock options . . . should be included" as income for support, citing her report. Kaseno's report said she was tasked with analyzing income attributable to *Shannon*, and noted generally that *Macilwaine* advises all stock options be included regardless of vesting.

At trial, Steven acknowledged he "exercised and sold stock options" in the past three years. But, as discussed above, Kaseno testified she was not asked to calculate stock option income attributable to Steven. During closing arguments, Shannon's counsel noted he has "stock . . . and stock sale income for all of the years and going forward."

After the trial court ruled it would include Shannon's stock sale gains in the *Ostler-Smith* arrears, her counsel said Steven's stock sale income was in his tax returns and they could do "basically a two-way *Ostler-Smith*." When the court asked if this "[m]ean[t] she wants a credit," she said, "Right . . . . [W]e can either put it in to the Dissomaster for that period which would be very complicated, or "we could just do . . . her . . . percentage versus his . . . percentage on those sales." The court denied the request, stating: "The [*Ostler-Smith*] percentages . . . just ordered[,] as applicable to the gain on certain stocks that were exercised and sold[,] relate to shares that are [Shannon's] separate property[,] not community property." The court further stated it was "not going to entertain a new motion" while giving its orders.

In the Statement of Decision, the trial court explained why it excluded Steven's "vesting and/or sale of stocks as income" as income available for temporary support:

> "Any stock options or stocks received by [Steven] . . . were awarded to him by virtue of the fact that they were community property assets subject to division. Each party received their one-half share of the community assets, and neither [party's] assets were considered in calculating interim support. [¶] In addition, [Shannon] did not argue this issue nor present evidence at trial."

Turning to Shannon's position on appeal, we begin by observing she does not address the trial court's additional grounds for denial: she did not present the issue during trial. We deem the issue forfeited. (*Badie, supra,*

39

67 Cal.App.4th at pp. 784–785.)  But even if she preserved the issue below and here, we disagree with her that the trial court improperly applied a "double standard" or otherwise abused its discretion.

The court awarded *Ostler-Smith* percentages on her stock options and stock sale gains in *addition* to base support.  To the extent the court would have considered Steven's stock option income, it would have been for *additional* support.  And, as discussed above, an *Ostler-Smith* award is meant to "capture fluctuations in the supporting spouse's income" (*Minkin*, *supra*, 11 Cal.App.5th at p. 949), to ensure support commensurate with that parent's lifestyle (for child support) and marital standard of living (for spousal support).  (*Kerr, supra*, 77 Cal.App.4th at pp. 95–97.)  A court could fairly decline to consider additional income of a *supported* spouse that derived from the spouse's share of community property stock options.

Shannon's arguments are not persuasive.

First, she contends that in calculating child support, a court "must determine the presumptive support level under the guideline formula," which includes "income of both parties" and vested stock options, citing *Macilwaine*.  Thus, she argues, the trial court improperly failed to consider Steven's stock options and stock sale income.  There is no dispute stock-related income must be considered for support (*Macilwaine, supra*, 26 Cal.App.5th at p. 532), but, again, the trial court appeared to implement this consideration via the *Ostler-Smith* percentages.  Shannon does not show this was error.  Further, when she belatedly sought inclusion of Steven's stock sale gains, she asked for a "two-way *Ostler-Smith*," stating it "would be very complicated" to put it in the Dissomaster.

She also asserts here that the trial court ignored "unrefuted evidence of Steven's income," citing a document showing $182,000 in stock sales from

2018 to 2020. She does not show this document was entered at trial, nor explain how it would impact guideline calculations, and her broader point lacks merit. The trial court did not ignore Steven's stock option income, but rather declined to include it, and could fairly do so for the reasons discussed above.

Second, Shannon argues the trial court's finding that " 'neither [party's] assets were considered in calculating interim support,' " was refuted by the "arrears to Steven . . . from [her] stock option assets." She is quoting the Statement of Decision, which said: "Each party received their one-half share of the community assets, and neither [party's] assets were considered in calculating interim support." Viewing the complete finding, we infer the court meant neither side's *community* assets were considered in interim support—consistent with the judgment, which said arrears were based on Shannon's "separate property stock income."

Finally, Shannon argues that in Steven's trial brief, he acknowledged that stock options he received should be applied to income for support. We disagree. What Steven said was that "[d]epending on how the [trial court] treats the *Gruen* retroactivity issue, this may be income applicable for support," *or*, if it found *Gruen* barred adjustment, the court must "apply the [*Ostler-Smith*] percentages as they stand only to [w]ife's . . . income." In other words, he viewed these as *alternatives*.

b. *Shannon's Stock Options She Purportedly Could Not Sell*

Shannon also argues the trial court "erred by including stock options she was restricted from selling as income available for support." According to Shannon, because she "was 'blocked' by her company from selling many of the stocks due to general insider trading concerns, they were not in fact 'available' to her to pay support."

41

As an initial matter, Shannon does not establish she asked the trial court to exclude this income, thus forfeiting the issue.  (See *In re Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481, 512 (*Brewster*) ["A party implicitly . . . forfeits claims of error if he or she fails to bring the error to the trial court's attention in an appropriate manner," citing *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1; see *Doers*, at p. 184, fn. 1 [" '[I]t is unfair to the trial judge and to the adverse party to take advantage of an error on appeal when it could easily have been corrected at the trial.' "].)

We would find no error, regardless.  In addressing the *Ostler-Smith* arrears on Shannon's stock options, the trial court noted *Macilwaine*'s holding that "stock options, once vested and free of legal restrictions to exercise and sell, must be counted as income available for support," and proceeded to award the arrears.  (*Macilwaine*, *supra*, 26 Cal.App.5th at p. 532.)  We infer the court found no legal restriction precluded this or other stock-based awards.  (*Fladeboe*, *supra*, 150 Cal.App.4th at p. 58.)

None of the purported evidence cited by Shannon shows otherwise.

First, Shannon cites a February 2020 income and expense declaration, which indicates on one page that she was blocked from selling stocks, and on the next that she paid attorney fees with stock sales.  She also notes Steven did not rebut her evidence on the legal restriction issue.  Even if Shannon introduced the declaration at the October 2021 trial (and she does not establish she did), the trial court could impliedly find her claim that she was unable to sell stock noncredible—regardless of Steven's evidence.  (*Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579 (*Jennifer K.*) ["It is settled that, 'in a bench trial, the trial court is the "sole judge" of witness credibility,' " and " 'may believe or disbelieve uncontradicted witnesses if there is any rational ground for doing so.' "]; see *In re Marriage of Calcaterra & Badakhsh* (2005)

42

132 Cal.App.4th 28, 36 [trier of fact may " 'accept as true only part of a witness's testimony and disregard the rest,' " "same rule" applies to documents].)  Meanwhile, there was other evidence at trial of Shannon's stock sales, in the Van Clief and Kaseno reports.

Second, Shannon focuses on the testimony of Van Clief and Kaseno, who acknowledged executives may be unable to sell.  However, both denied knowledge of Shannon's status.  When Kaseno was asked about executives being blocked from selling shares, she said, "[T]hat is true with a lot of executives.  But I don't know that to be true specifically about her."  Similarly, Van Clief "assume[d] . . . there are times when [Shannon] would have a blackout" but said she did not "have a specific memory on that."

Third, Shannon contends she argued at trial that she was sometimes blocked from selling stock as an "insider," and was "currently blocked from any sale of stocks . . . ."  Both points were made by her counsel during the rulings at the end of trial, and counsel argument is not evidence.  (*Fuller, supra,* 84 Cal.App.4th at p. 1173.)  They do not help her anyway.  Her counsel made the first point while the court was addressing logistics, and she noted Shannon could set up something called a "10b5[-]1 account" to "get around" the fact that she was an insider and "her stocks are sometimes blocked from being exercised."  Her counsel made the second point while seeking more time to pay the arrears.  If anything, the comments reflect there *are* ways for Shannon to satisfy stock-related obligations.[14]

---

14    "A 10b5–1 plan is an agreement which allows corporate insiders to set a schedule by which to sell shares over time . . . ."  (*Elam v. Neidorff* (8th Cir. 2008) 544 F.3d 921, 928 fn. 3.)

3       *Steven's Arguments*

    a.      *Stock Option Allocation*

Steven argues the trial court erred by applying the *Nelson* formula to allocate stock options. He establishes no abuse of discretion.

We start with some additional facts. Scanlon, Arena's human resources representative, testified their annual bonus is used to "recogniz[e] . . . past performance." Their equity awards are "forward-looking," and "future-oriented," and the value "comes from . . . future efforts." She said a "primary reason[ ]" they grant equity is as "a long-term incentive," as they "want employees to remain at the company . . . ." She noted stock option value varies, vesting stops when an employee leaves Arena, and they have a set period to exercise vested options. Scanlon agreed options are "also given as an incentive to stimulate increased effort" from employees, but disagreed they are given to "compensate employees for . . . past services" or "make up for a lower salary . . . ." She also was not aware of Arena using them to give employees a tax break.

Scanlon further testified managers had more discretion to set bonuses, and less for stock option grants, noting most would "grant the same number of shares" by job level (e.g., director). Shannon also testified options were granted by level, and that they were normally given around the time of performance reviews. Scanlon said option grants did "[n]ot typically" depend on the performance review.

In ruling on stock option allocation, the trial court found Arena's bonuses were to "reward past performance," while the "equity awards with future vesting dates" were to "motivate and retain the employee." It noted that unlike deferred compensation, "[n]on-vested options" do "not survive termination" and "may never have value." The court found *Hug*

44

"has . . . maybe not a unique set of facts, but they are definitely different from this set of facts," so it was "going to . . . use the *Nelson* formula." The court concluded using *Nelson* would "result in a more equitable allocation of the parties' community and separate interests," and "exercise[d] its discretion accordingly."

We now turn to Steven's arguments. As a preliminary matter, he claims the trial court applied an incorrect legal standard and we apply de novo review. We disagree. We "review the trial court's [methodology] to divide the stock options here under an abuse of discretion standard." (*In re Marriage of Steinberger* (2001) 91 Cal.App.4th 1449, 1459.) And *Hug* specifically recognized a trial court has "broad discretion to select an equitable method" of allocating stock options—as Steven acknowledges. (*Hug, supra*, 154 Cal.App.3d at p. 782; accord, *Nelson, supra*, 177 Cal.App.3d at pp. 154–155.)

Steven then contends the trial court erred by "applying *Nelson*, instead of [*Hug*], *Harrison*, or [an]other methodology . . . ." (capitalization omitted.) He does not elaborate on *Harrison* or other methods, and forfeits those points. (*Badie, supra*, 67 Cal.App.4th at pp. 784–785.) We focus on *Hug* and *Nelson*, and summarize the approaches in those cases.

*Hug* used commencement of employment as the start date. (*Hug, supra*, 154 Cal.App.3d at p. 783.) There, the record supported an "implied finding that the [stock] options were earned from the commencement of [husband's] employment," including their role in replacing benefits from his prior employer and use "in lieu of present compensation" when the company's success was limited. (*Id*. at p. 789.) The Court of Appeal held it was not an abuse of discretion for "the trial court to . . . apply[] a time rule," where the "number of options determined to be community property is a product of a

45

fraction in which the numerator is the period in months between the commencement of the spouse's employment by the employer" and the date of marital separation, and the "denominator is the period in months between commencement . . . and the date when each option is first exercisable . . . ." (*Id.* at p. 782.) The court "stress[ed] that trial courts . . . are not limited to this formula," and "no single rule or formula is applicable" to every case. (*Id.* at p. 793; *id.* at pp. 785, 789 [other factors include inducement, retention, and favorable tax treatment].)

*Nelson* used the grant date as the start date. (*Nelson, supra,* 177 Cal.App.3d at p. 155.) There, the trial court "utilized a formula in which the numerator was the number of months from the date of grant of each block of options" to marital separation, while "the denominator was the period from the time of each grant to its date of exercisability." (*Ibid.*) The Court of Appeal disagreed with the wife that the trial court should have applied *Hug*, stating it "found nothing inequitable" in the court's formula, and "under the circumstances," it "was probably a better method of division." (*Ibid.*) It explained the main difference was that "while both reward future productivity, the *Hug* options appear to have been designed to attract new employees and/or more generously reward past services," whereas "only prospective increases" in stock value could benefit these option holders. (*Id.* at p. 155, fn. 4.) Thus, it was "appropriate to place more emphasis on the period following each grant, . . . than on the employee's entire tenure" at the company. (*Ibid.*)

Here, the trial court determined the facts were "definitely different" than in *Hug*, and using *Nelson* would "result in a more equitable allocation . . . ." Scanlon's testimony supports the court's use of *Nelson*. She testified unequivocally that Arena used equity awards as *forward*-looking

46

compensation for retention, and *not* to reward past work or instead of salary—like the equity awards in *Nelson*, and unlike those in *Hug*. She also testified, consistent with *Nelson*'s prospective focus, that the value of Arena options can vary, they cease vesting at termination, and vested options must be exercised shortly thereafter.

Steven establishes no abuse of discretion. He focuses solely on why the trial court should have applied *Hug*, and improperly construes the record against the judgment in doing so.

First, Steven asserts that *Hug* factors include retention, tax treatment, "providing alternatives" when a company is short on cash, and "compensating for past services," and they "match the testimony." But Scanlon denied that Arena uses stock options for tax treatment, salary replacement, or to compensate past work. As for retention, she did testify that was a primary aim of granting equity, but the trial court could impliedly conclude that factor was also consistent with *Nelson*, if not more so. (See *Nelson, supra,* 177 Cal.App.3d at p. 155, fn. 4 [both *Hug* and *Nelson* options were meant to "reward future productivity," but the benefit of the latter turned on "only prospective increases" in stock value].)

Second, Steven argues the retention purpose of the stock options, plus the fact that they were given by level and "near the time of performance reviews," weighs in "favor of [them] being given for past services . . . ." He cites Shannon's testimony that options were given around the time of performance reviews—but he ignores Scanlon's denials that they were tied to such reviews or meant to reward past work. Further, granting options by level could reasonably mean they are *not* based on past performance (and the court could impliedly reject Steven's contrary view that they are a "reward[ ] for past work, in achieving the new level").

47

b.    *Shannon's 2018 Stock Options*

Steven also argues the trial court "erred in disregarding the 2018 tranches of stock options," citing Van Clief's division of shares for that year. He states the court "observed it had no information for 2018," likely "meaning that the . . . Kaseno report didn't translate the Van Clief reported shares into dollar amounts," and argues section 2550 required the court to divide these assets or reserve jurisdiction to do so.

It is unclear whether Steven is addressing property allocation, support arrears, or both, but the argument lacks merit on either ground.

Regarding property, section 2550 states the "court shall, either in its judgment . . . or at a later time if it expressly reserves jurisdiction . . . , divide the community estate of the parties equally." The judgment stated the trial court adopted the Van Clief report's application of *Nelson* to divide the stock options. The report includes shares pursuant to one 2018 option grant, and the court made a minor modification by giving Steven additional shares pursuant to another one. He does not establish any 2018 shares were from excluded from the property division.

Turning to support issues, during the trial court's ruling on the *Ostler-Smith* stock option arrears, the court asked the parties "what should [the court] look at" and both counsel identified Kaseno's report. The court noted, "But I only have 2019," and then stated, "Based on the evidence presented at this trial, I'm going to go back to 2019. I don't have information for 2018." We thus agree with Steven that the court impliedly found the 2018 stock option information missing based on the lack of calculations in the Kaseno report. But he does not show he objected at the time to the trial court's finding that it lacked this information, or asked the court to reserve jurisdiction. He cannot establish an abuse of discretion based on an issue he

48

never raised—particularly when it was his expert who failed to supply the omitted calculations. (Cf. *Brewster*, *supra*, 45 Cal.App.5th at p. 512.)

          c.     *Shannon's "Exercised Stock-Options From Sales"*

Steven next contends the trial court "fail[ed] to divide the exercised stock-options from sales in 2019 and 2020." Citing *Macilwaine* and *Cheriton*, he criticizes Kaseno's exclusion of stock sale gains from the *Ostler-Smith* arrears, arguing the court "failed to award [his] interest . . . in this block of sold . . . options . . . ." He does not establish error.

Although Kaseno did not incorporate her calculation of Shannon's stock sale gains in her income analysis, the trial court included these amounts in setting the *Ostler-Smith* arrears. Steven suggests Kaseno's calculation still supports error, because it excluded options that "vested in periods outside the scope of [the] analysis." He contends we can interpret the report de novo, and offers a "quick calculation" in this regard. We reject these contentions.

First, Steven does not establish he raised this specific issue below, supporting forfeiture; we disagree with him that it was sufficient to seek "division of all the options and stocks repeatedly throughout the record . . . ." (*Brewster*, *supra*, 45 Cal.App.5th at p. 512.) Kaseno was his expert, and he could have asked her to supply the calculations he seeks. At minimum, he could have flagged the purported omission for the trial court. We also decline to accept his proposed calculation, which amounts to a disfavored request to take new evidence on appeal. (Cf. *Monsan Home, Inc. v. Pogrebneak* (1989) 210 Cal.App.3d 826, 830 ["power to invoke" Code Civ. Proc., § 909, statute authorizing additional evidence on appeal, "should be exercised sparingly, ordinarily only in order to affirm"].)

Second, even if Steven had preserved the issue, Shannon argues she testified she already paid Steven his share of the sale proceeds. The record

provides support for this assertion. Her testimony was that "when [they] sell stock together and . . . split it, [she] give[s] him his split of the proceeds . . . ." Van Clief similarly noted Shannon split the proceeds of her stock option exercises with Steven (while he kept the cash from his exercises).[15]

> d. *Trial Court's Use of Net Amounts for RSU/PRSUs*

Finally, Steven argues the trial court erred by using net values for the *Ostler-Smith* arrears based on Shannon's RSU/PRSUs, despite the trial court and counsel agreeing gross amounts should be used.

After briefing, Shannon filed a motion to augment a FOAH dated April 30, 2024, which she contends "corrected the mistaken calculation," rendering the issue moot. In Steven's response, he concedes the court corrected the mistake and the issue is moot, but opposes augmentation as prejudicial and confusing, noting the order addressed other matters and the "fact of the 'mistake' " could impact other issues. We augment the April 2024 FOAH, solely to assess whether the RSU/PRSU calculation issue is moot. (*In re Salvador M.* (2005) 133 Cal.App.4th 1415, 1422 [concluding it was proper to augment the record with document showing issue was moot]; cf. *Vons v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [absent extraordinary circumstances, " 'when reviewing the correctness of a . . . judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered' "].)

" 'An appellate court will not review questions which are moot . . . .' " (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 566 (*Lester*).) A "question

---

[15] To the extent Steven's use of the term "interest . . . in this block of sold . . . options" implicates property allocation error too, he does not show he raised that issue below, either, and offers no substantive argument here.

50

becomes moot when, pending an appeal . . . , events transpire which prevent the appellate court from granting any effectual relief." (*Ibid.*)

The facts are essentially undisputed. Kaseno included the values of Shannon's RSU/PRSU awards in income available for support. However, the values in her analysis were lower than those in Shannon's paystubs. While discussing the arrears, the trial court stated, "I think the other issue is that these numbers are gross numbers . . . . Who's going to pay the tax on these?" Steven's counsel said, "I think [*Ostler-Smith*] works off of gross," and Shannon's counsel said, "It's always gross . . . ." Neither party raised an issue about Kaseno's RSU/PRSU amounts at the time.

Steven's counsel raised the issue at the October 5, 2022 hearing where the trial court entered the corrected judgment. He said, "We think that your honor had intended to apply the PRSU's on gross amounts and inadvertently used our expert [Kaseno's] net calculations. At the time of the trial, we didn't realize she had done a net calculation." Shannon's counsel argued, "We're not sure if that was a mistake or not, because some of the PRSU's were cashed out to purchase options," and she "need[ed] an expert saying "I made a mistake . . . ." The court told Steven's counsel, "You may be right . . . I don't know. My understanding . . . is that the [*Ostler-Smith*] percentages apply to gross numbers, not net." The court invited the parties to enter a stipulation, and if they did not agree, "that may be the subject of a motion or potentially . . . be subject to the appeal."

Steven raised the issue on appeal, and also filed a motion to set aside and correct the mistake. In the April 2024 FOAH, the trial court "grant[ed] the request . . . and correct[ed] the mistake that was made," which "result[ed] in Shannon owing . . . $18,975.55 as additional child support and . . . $26,988.25 as additional spousal support." The court explained that "[a]bsent

51

a highly unusual circumstance, which is not reflected here, the *Ostler-Smith* calculation is done off . . . gross income," and Steven, Shannon, and Kaseno now "all agree[d] that an error was made." The court also observed that "[n]either party took the position that [it] should not address issues due to the pending appeals . . . ."

We conclude the RSU/PRSU calculation issue is moot. The trial court has corrected the calculation at issue, and neither party contends it lacked jurisdiction to do so. Accordingly, there is no effective relief that we can provide on this issue. (*Lester, supra,* 84 Cal.App.4th at p. 566).[16]

F.     *Vacation Pay*

1.     *Additional Facts*

At trial, Shannon testified her accrued "paid time off," or PTO, hours at the time of marital separation in 2018 were "[p]robably close to the cap, which [was] 240." At the time, she was accruing "something like 20 days a year . . . ." She said Arena later switched to a "flexible time off" plan, at which point they paid out accrued PTO, and her cashout was "$35,000 before taxes."

Steven's counsel asked Shannon about Exhibit I, which she identified as a "time-off balance from the old . . . HR system." She agreed it showed her accrued vacation time as of May 10, 2018, the marital separation date. The document's "vacation time" row showed a "carryover" balance of 225.06 hours,

---

[16]     Steven had suggested during briefing that the trial court's error may have extended to options, and also left some community property undivided. But the specific amounts he identified pertained to RSU/PRSUs; he may have been confusing award types, as shown by his use of the term "PSU/RSU stock options" at one point. Further, Shannon's RSU/PRSUs were awarded after separation, Kaseno treated them as separate property, and Steven does not show that treatment was erroneous.

plus 22.94 earned hours, plus 8 taken hours, and minus 40 scheduled hours, equaling a balance of 200 vacation time hours.

During closing arguments, Steven's counsel cited Exhibit I, arguing it showed Shannon's accrual at the date of marital separation and "says that she has 288 hours of vacation pay." He also cited Exhibit E, a 2021 paystub, to argue she "cashed it out . . . for $35,126.40." Exhibit E does not list accrued hours. He then described how he calculated Steven's share: he identified an hourly rate for Shannon (by dividing her twice-monthly salary by 80), "[m]ultipl[ied] that by the 288 hours," and "divid[ed] by two . . . ." He stated the result was "based on the vacation balance at the date of separation, her hourly pay and the amount that she cashed out." He did not explain how his calculation accounted for the $35,126.40 cashout amount.

At trial, the court ruled, "The 288 hours of vacation at [the] date of separation are . . . community property. And so the calculation I performed results in [Steven's] share being equal to $21,368." The Statement of Decision included a substantially similar explanation.

2.    *Additional Law*

Section 2552, subdivision (a), states that "[f]or the purpose of division of the community estate upon dissolution of marriage . . . , the court shall value the assets and liabilities as near as practicable to the time of trial." This principle has been applied to vacation pay. (See *In re Marriage of Moore* (2014) 226 Cal.App.4th 92, 103–104 (*Moore*) [trial court erred by "not dividing [the accrued vacation pay] based on its cash value at the time of trial"].)

The "trial court possesses broad discretion to determine the value of community assets as long as its determination is within the range of the evidence presented." (*In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670 (*Nichols*).)

53

3.    *Analysis*

Shannon argues that by adopting Steven's calculations, the trial court erred in two ways:  by "valuing the vacation pay at the date of separation rather than its value closest to trial," and by "failing to divide the current value of the pay ($35,126.40) in half ($17,563.20) . . . ."  On reply, she elaborates that the calculations also lack support because the record shows she accrued 240 hours, not 288 hours.

We conclude Shannon establishes an abuse of discretion, but do not adopt the $17,563.20 amount and remand for recalculation.

First, Steven's calculations did not reflect the value of Shannon's vacation time at the time of trial, as required.  (§ 2552, subd. (a); *Moore*, *supra*, 226 Cal.App.4th at pp. 103–104.)  Here, although Steven used an hourly rate based on Shannon's 2021 salary, he multiplied it by a purported 288 hour accrual as of May 2018 (which was not even accurate, as discussed next).  And his calculations did not account for the 2021 cashout figure, even though it reflected an hour accrual closer to trial.  Thus, by adopting Steven's calculations, the trial court erroneously accepted a value based in part on 2018 information, not value at or close to the time of trial.

Second, the exhibits relied upon by Steven do not establish Shannon accrued 288 vacation hours in 2018, or later, whereas Shannon testified the cap was 240 hours.  Exhibit I, the "Time Off Balances" document, uses plus, minus, and equal symbols, making clear how to calculate the numbers—and they are consistent with a 240 hour cap.  Shannon carried over 225.06 hours from a previous pay period, earned 22.94 hours, and deducted 8 hours from use, totaling 240 accrued hours.  Her 40 scheduled hours would be deducted from that accrual, as shown by a preceding minus sign, resulting in the listed

200 hour balance. As for Exhibit E, the paystub showing the cashout balance, it does not identify an hours accrual.[17]

Steven's arguments lack merit. He argues Shannon's testimony did not refute his calculations based on Exhibit I; the cashout figure reflected an "unknown credit and debits of hours, and after-tax treatment"; and "dollar figures are not necessary to 'value.'" Shannon *did* testify, contrary to Steven's calculations, that her vacation hours were capped at 240—which, again, Exhibit I reflects. She also testified the 2021 cashout amount was before tax, and although the hour accrual it represents is unclear, that calculation can be performed. What is not sufficient is Steven's counsel claiming Exhibit I "says . . . 288 hours" when it does not. Lastly, we disagree the trial court could disregard the 2021 cashout amount, given its closer proximity to trial than the 2018 statement. (See *Nichols*, *supra*, 27 Cal.App.4th at p. 670 [trial court's discretion extends to "determination . . . within the range of the evidence presented"].)

Finally, we decline Shannon's request to divide the vacation pay based on the cashout value of $35,126.40. She contends this was the "value closest to the time of trial," but the trial court has not made that assessment. We remand for recalculation consistent with section 2552.

---

17    We note that based on the salary listed on Exhibit E, the cashout would reflect around 232 hours, under a 240 hour cap. There is other evidence for a 240 hour cap too. Shannon directs us to a December 2018 paystub showing 240 accrued hours. And an Arena Employee Handbook lodged with her motion to seal has a section titled "Vacation," which states in part: "Employees may carry-over accrued and unused vacation . . . , up to a maximum of 240 hours. Employees will not accrue any vacation amount above 240 hours."

G.    *Attorney Fees*

   1.    *Additional Facts*

In his trial brief, Steven sought attorney fees, including under section 2030.  He argued Shannon "earn[ed] significantly more" than him, and should contribute $75,000 toward his fees.  He said he had spent over $88,000, and "still owes another $22,000+ in unpaid fees . . . , not including trial costs."  He also argued Shannon "owe[d] a mandatory contribution under [section] 3557 for fees associated with collection of unpaid child support arrears," and a "fair figure" would be $3,000.

At trial, Shannon's counsel asked Steven if he remembered receiving attorney fees from Shannon.  He said he did not remember, but did not "doubt it at all."  She also asked him about transactions with his sister.  He testified, "There were times I loaned to my sister and there were times she loaned to me.  There were times she needed to use a credit card and I let her and she paid me back.  It's a combination of different situations."  He denied the amounts were income or gifts.

Steven's counsel asked him how much he owed counsel's office.  Steven said, "Tens of thousands.  I don't know the current amount.  I charged as much as I thought I could . . . . I think at least 15,000, maybe more.  That was before trial."

During closing arguments, Steven's counsel confirmed they sought $75,000 under section 2030 as need-based fees, asserting Shannon's income was "almost ten times his salary" of $130,000 and "[h]e's been unable to keep up with his fees."  He stated, "He currently owes 22,400 two weeks ago.  My best estimate right now is 33,500."  Shannon's counsel argued Steven was "not crediting" her for already ordered fees and that he was able to pay his

56

own fees, citing his stock options and transactions with his sister that could be considered as gifts.

The trial court found that "based on the disparity in income and assets between the parties," Shannon "will make a contribution to [Steven] . . . for attorney fees." In the judgment, the court awarded him $30,000 in "both need-based attorney fees pursuant to . . . [s]ection 2030 as well as . . . [s]ection 3557 in the pursuit of the . . . arrears."

2.    *Additional Law*

"The purpose of an attorney fees award in a marital dissolution proceeding is to provide, as necessary, one of the parties with funds adequate to properly litigate the matter. [Citation.] The party seeking an award of need-based attorney fees has the burden of establishing need." (*In re Marriage of Bendetti* (2013) 214 Cal.App.4th 863, 868 (*Bendetti*).)

Under section 2030, the trial court shall order one party to pay the other party "whatever amount is reasonably necessary for attorney's fees," if "necessary based on . . . income and needs . . . ." (§ 2030, subd. (a)(1), *id.* subd. (b) [considerations include disparity in access to funds].) In assessing what is "just and reasonable" under the circumstances, the court shall consider "the need for the award to enable each party . . . to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320." (§ 2032, subd. (b).)

Section 3557 provides for reasonable attorney fees to enforce an existing child support order where, among other things, there is a "disparity in access to funds to retain counsel" and "one party is able to pay for legal representation for both parties . . . ." (*Id.*, subd. (a).)

57

The trial court has "broad discretion in determining the amount of fees to award and, on appeal, we review any such award for an abuse of that discretion." (*In Marriage of Pearson* (2018) 21 Cal.App.5th 218, 235; see *Bendetti*, *supra*, 214 Cal.App.4th at p. 868 [fee award "will not be disturbed on appeal absent a clear showing of abuse"].)

3. *Analysis*

Steven argues attorney fees were "mandated by [section] 2030, given the wide disparity in incomes, and [section] 3557, for Shannon's failure to pay support," and the trial court's fee award of $30,000 was "not proportionate" to actual costs and "below a reasonable level." The court did award fees on the grounds asserted here by Steven, and he does not establish it abused its discretion by awarding $30,000.

First, Steven focuses on the amount of his legal costs. He asserts his income and expense declaration "showed his fees were $88,260 and he owed $22,436" just before trial. He then asserts, without record citations, that the "trial time alone probably ran an additional . . . $13,000," using a $325 hourly counsel rate and his own calculation (i.e. "8 hrs. x 5 days x $325 = $13,000"). Neither assertion has merit. Regarding previously paid fees, Steven acknowledged Shannon already gave him some fees—making it unclear whether the $88,260 figure accounted for them. As for amounts owed, Steven's counsel did argue at trial that he "owe[d] 22,400 two weeks ago." But his counsel then said his "best estimate right now is 33,500," suggesting trial fees were an additional $11,100, not $13,000. At any rate, even if Steven's total fees were in the range he claims, the court did not have to accept he needed the claimed $75,000 to pay them (much less that the fees were reasonable). (Cf. *Jennifer K.*, *supra*, 47 Cal.App.5th at p. 579 [trial court is sole judge of credibility]; *In re Marriage of Schleich* (2017)

8 Cal.App.5th 267, 289 [addressing ability to pay support; trial court was "not required to accept the testimony by [h]usband's expert that [he] had told him that $60,000 remained" in account balances].)

Second, Steven contends Shannon's income available for support was "strikingly higher than [his], for the three years preceding trial." The trial court acknowledged Shannon's higher income when it stated it was granting Steven's fee request "based on the disparity of incomes and assets between the parties." The court also recognized Shannon's "greater earning power" in its section 4320 findings. These findings did not necessitate granting all of Steven's requested fees.

Finally, Steven argues his income and expense declaration before trial "showed him owing $30,916 to his sister and $52,522 for credit cards (not counting his student loan in deferral then of $92,286)." He cites nothing to show he raised these purported debts at trial in connection with attorney fees, and other evidence calls some into question. For example, he testified he and his sister made loans to each other, and the court could disbelieve his denial that they were gifts. He also testified he paid some attorney fees by credit card, and does not explain if any of the credit card debt overlaps with the claimed fees. Steven also fails to address the financial resources available him to manage his obligations. (See *Falcone, supra,* 203 Cal.App.4th at pp. 974–975 [trial court may award fees "based on [the parties'] relative circumstances," including income and assets].)

H.    *Motions For Reconsideration and Set Aside*

Steven argues the trial court erred by not reconsidering the judgment as to spousal support, given the purchase offer for Shannon's company; not setting aside the judgment based on alleged fraud by her counsel in

preparing the judgment; and by finding clerical error as the grounds for the corrected judgment. He does not establish any reversible error.

1. *Additional Facts*

At trial, the court deferred the arrears payments, with the stock option portion of the spousal support arrears stayed pending appeal, and the other child and spousal support arrears due at six months or one year. The judgment reflected these terms.

Shannon's counsel prepared the original judgment, which was filed on February 28, 2022. All dates in this section are in 2022 unless noted. Among other differences, whereas the corrected judgment addresses the support arrears in sections titled "Temporary . . . support orders," the original judgment titled them "Modification of past . . . support orders" and said the arrears were from "retroactive modification . . . ."

On March 9, Shannon filed a notice of appeal from the original judgment; Steven filed his cross-appeal later that month.

On March 16, Steven filed a motion to reconsider based on Code of Civil Procedure section 1008, subdivision (a). He contended the new or different facts were that Shannon's company received a purchase offer (hereafter, company sale), which would raise the stock price and accelerate vesting. He asked the court to remove, increase, or delay the spousal support cap, and to accelerate 50 percent of the arrears payments. Shannon opposed the motion.

On July 14, Shannon filed a "Motion to Set Aside due to clerical error per CCP 473(d)."

On July 21, Steven filed a memorandum in connection with his motions to reconsider and set aside (the latter of which was not in the record, but the trial court would address). On set aside, he claimed Shannon's conduct in preparing the original judgment, including the retroactivity language,

60

amounted to extrinsic fraud, and setting it aside would permit the court to consider the company sale.

On August 2, Shannon filed a declaration "request[ing] the Court enter the revised Judgment (See Lodgment 1) Nunc Pro Tunc to February 28, 2022 to fix a clerical error."

On October 5, the trial court heard the parties' motions.

First, the trial court denied Steven's reconsideration motion, stating entry of the judgment "divests the trial court of authority" to rule on reconsideration. The court said it did "not think [the motion] was timely," noting it was filed after both judgment and appeal. It also found the company sale was not a "proper basis for reconsideration," stating in part that this was a "future event," not a "new or different fact," and there also was no "concrete" information on the sale.

The trial court further found that "even if [it] had authority to reconsider" the spousal support cap, it would "leave it as is" noting it was "placed not as a function of [Shannon's] income as much as the marital standard of living" and an income increase from a company sale was irrelevant. The court also found the payment issue was moot as to non-stayed amounts, because most were paid and remaining amounts were due shortly. It kept the stay in place, as they related to an area in flux (i.e., application of *Ostler-Smith* to stock options).

Second, the trial court denied Steven's motion to set aside on the basis of fraud, stating it did not find his claim was "supported by the evidence" or "that there was fraud." It explained, "An incorrect judgment was submitted. It was not what the court fully intended, and that's why it will be vacated and replaced with a corrected version . . . . But . . . these corrections or errors

61

were acknowledged by [Shannon's counsel] as soon as they were brought to her attention."

Third, regarding the motion to set aside based on clerical error, the trial court found the "terminology problematic," because it was "not really setting aside the judgment," but rather "making corrections to make sure the judgment reflects the court's intended decisions." The court called it a "motion to correct the judgment," and indicated it would enter the corrected judgment nunc pro tunc, as it would reflect "the order[s] that should have been . . . filed . . . ."

The trial court adopted the proposed corrected judgment lodged by Shannon on August 2 (which included the revised "temporary support" language noted above), and added interlineations at the hearing. The court denied Steven's request to renew reconsideration in a purported window before entry of the corrected judgment, stating it was "replacing one for the other." The court also denied party requests for fees, finding they were "incurred on both sides, perhaps unnecessarily, but not due to any sort of bad motive or sanctionable behavior by either side" (and that it lacked declarations supporting the fees).

At the end of the hearing, Shannon's counsel asked if the trial court wanted anything drafted. The court said it was unnecessary, but asked Steven's counsel if he wanted to draft anything. He said, "I think the meat and potatoes is the new judgment. So I'm perhaps just denying all the fees and the other requests." The court said okay. On June 16, 2023, the court entered a FOAH for the hearing, which summarized the matters resolved at the hearing, including the fee denial (2023 FOAH).

2.      *Status of Appellate Proceedings*

Before we proceed to Steven's arguments, we must clarify the status of the appellate proceedings and the matters before us. Steven filed a separate appeal from the 2023 FOAH (D082959). In connection with review of his civil case information statement (CCIS) there, we issued orders stating, inter alia, that the motion for reconsideration was reviewable only from the underlying judgment (Code Civ. Proc., § 1008, subd. (g)), the corrected judgment may have resolved his set-aside motion, and the new appeal was limited to the set-aside motion, subject to briefing on appealability. Accordingly, we address Steven's challenge to denial of his reconsideration motion in these appeals from judgment (but note the FOAH is substantially consistent with the trial court's October 5, 2022 ruling).[18] Further, because Steven could have, and has, raised his set-aside arguments here, we address them here. (Cf. *In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 119 [law does not allow review of a " 'decision . . . from which an appeal might previously have been taken' "]; *People v. Neely* (1999) 70 Cal.App.4th 767, 782 ["there is no good reason why the point can be raised for the first time on a subsequent appeal"].) We express no opinion on the remaining scope of D082959.

3.      *Denial of Steven's Motion for Reconsideration*

Steven argues the trial court erroneously failed to reconsider certain spousal support issues because his motion was properly before the court; he alternatively requested a new trial; and his motion was supported by new and different facts consisting of the company sale.

---

[18] We grant Shannon's request to augment the 2023 FOAH, in light of the unusual procedural posture. On our own motion, we also take judicial notice of the CCIS orders in D082959. (Evid. Code, § 452, subd. (d); § 459.)

63

Under Code of Civil Procedure section 1008, "a party seeking reconsideration of a prior ruling upon an alleged different set of facts must 'provide both newly discovered evidence and an explanation for the failure to have produced such evidence earlier.' " (*Drake*, *supra*, 53 Cal.App.4th at p. 1168.) "A trial court's ruling on a motion for reconsideration is reviewed under the abuse of discretion standard." (*New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 212.) A motion for new trial is subject to different, mandatory statutory requirements (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 336), and its resolution is likewise governed by abuse of discretion of review. (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 187, 194 (*Sole Energy*).)

Steven establishes no abuse of discretion or other error here.

First, Steven argues his motion was properly before the trial court, because he timely filed it within 10 days of judgment and the court could consider it despite the entry of judgment and pending appeal. When he filed the motion is not at issue, and Steven does not show the court erred in finding that judgment entry and the appeal precluded review.

Regarding judgment entry, Steven disputes that Code of Civil Procedure section 1008 limits reconsideration of judgments. Quoting subdivision (e), which states the section "applies to all applications to reconsider any order . . . whether the order . . . is interim or final," he argues this "reference to 'final' seems to denote it applies to judgments." He further argues "the statute does not rule out its application to judgments." But Steven essentially concedes the section does not *address* judgments, while ignoring its context: a Code of Civil Procedure chapter titled "motions and orders." The case law is also to the contrary. (*Safeco Ins. Co. v. Architectural Facades Unlimited, Inc.* (2005) 134 Cal.App.4th 1477, 1482 ["It is well settled

64

that entry of judgment divests the trial court of authority to rule on a motion for reconsideration."]; *Passavanti v. Williams* (1990) 225 Cal.App.3d 1602, 1606 [court may then "correct judicial error only through certain limited procedures such as motions for new trial"].)  Steven's reliance on *D.R.S. Trading Co., Inc. v. Barnes* (2009) 180 Cal.App.4th 815 is misplaced, as the parties there sought "reconsideration not of the merits of the judgment itself, but of their postjudgment motion for relief from default."  (*Id.* at p. 820.)

As for the appeal, Steven acknowledges *Young v. Tri-City Healthcare District* (2012) 210 Cal.App.4th 35 held a "trial court lost jurisdiction over a reconsideration during the pendency of an appeal."  However, citing a trial court comment that the motions to set aside were not stayed, he argues that "[s]ince the court had jurisdiction to rule on the set aside," it "should have reconsidered" the spousal support limits and upward mobility.  He also claims he requested " 'set aside' be consolidated with the reconsideration."  Steven cites no authority that a set-aside motion can be used to avoid procedural limits on reconsideration, regardless of whether they are considered together.  Further, his set-aside motion was based on alleged extrinsic fraud in judgment preparation, and the spousal support limits did not change in the corrected judgment.

In any event, Steven cannot establish reversible error, because the trial court explained it would have denied the reconsideration relief he sought, including as to the spousal support cap, and he does not show that denial would be an abuse of discretion (see *post*).  (See *Randy's Trucking, Inc. v. Superior Court* (2023) 91 Cal.App.5th 818, 844 [no abuse of discretion in denying reconsideration, where the trial court examined the new evidence and its "intent was to reaffirm the earlier ruling"; to "remand for the trial

65

court to grant the reconsideration motion and then reaffirm its earlier ruling would be futile and a waste of judicial resources"].)

Second, Steven summarily argues in his opening brief that he asked the trial court to "consider his motion for reconsideration [as] a request as well for a 'new trial . . . .'" On reply, he cites *Sole Energy* as authority for the trial court's "discretion to treat a motion for reconsideration as a motion for new trial." (*Sole Energy, supra*, 128 Cal.App.4th at pp. 193–194.) He then argues his motion could be treated as one for a new trial or set-aside, and that while the court "denied [set-aside] on the grounds of fraud," it "could easily grant it" on grounds including excusable neglect and surprise. He forfeits these belated points, and we would reject them regardless. Steven asserts *Sole Energy* found the reconsideration motion there "adequately set forth the grounds on which the motion was to be made, and its bases, and therefore met the procedural requirements of a motion for a new trial." (*Id.* at p. 195.) But he does not show the trial court abused its discretion by declining to accord such treatment here. Nor does he establish the court erred by impliedly rejecting any other set aside grounds he may have raised (e.g., surprise).

Finally, regarding the merits of reconsideration, Steven relies on the sale of Shannon's company as a new or different fact. The trial found this was not a proper basis for reconsideration; it would not change the cap, even if it could; and the requested payment changes lacked merit for other reasons. Steven does not address any of these findings, and cannot show they were error. (*Badie, supra*, 67 Cal.App.4th at pp. 784–785.) The arguments he does offer lack merit.

Focusing first on the payments, he argues the trial court abused its discretion by denying his request to accelerate half the payments, despite

evidence that Shannon "spent freely" while withholding them. But the court found the issue was largely moot, it explained why it was keeping the stayed amounts in place pending appeal (i.e., they involved a less-settled area of law), and it could fairly do so. Steven also argues the court "would not have granted delays/stays had it known that within a couple months" Shannon's company would be sold. The court *did* know about the sale at the October 5, 2022 hearing, and kept the stay in place.

Steven then offers multiple reasons it was error to keep the spousal support cap of $35,000 per year. He argues the cap is unfair, because the company sale would limit his *Ostler-Smith* amount to one year and $23,000 (i.e., after base support). Even assuming a sale closed within the spousal support period, the applicable *Ostler-Smith* award was based on *all* sources of Shannon's income, and she could obtain other work and income. Steven next argues the trial court would not have imposed a cap if it knew about the sale. But the court found any income increase from a company sale was irrelevant to the cap (as the cap was based on the marital standard of living)—making clear it *would* still have imposed the cap. Additionally, Steven claims that retaining the cap "violated [his] standard of living" as part of an upwardly mobile couple. As explained above, he did not argue upward mobility to the trial court, and he cannot establish error on that theory.[19]

4. *Denial of Steven's Motion for Set Aside Based on Fraud*

Steven argues the "actions of Shannon through her counsel in drafting the initial judgment," including using retroactivity language, amounted to

_____

[19] Steven contends the trial court should have reconsidered the spousal support termination date too, but offers no substantive argument. We note the trial court could impliedly decline to reconsider the termination date for similar reasons it as it declined to alter the annual cap.

67

extrinsic fraud; this is grounds for set aside; and it further "justif[ies] his requests to lift the cap and the delays/stays . . . ." Elsewhere, in disputing there was clerical error, he suggests that extrinsic fraud is an issue we can decide de novo. These contentions lack merit.

Extrinsic fraud " 'usually arises when a party . . . has been "deliberately kept in ignorance of the action . . . , or in some other way fraudulently prevented from presenting his claim or defense." ' " (*In re Marriage of Modnick* (1983) 33 Cal.3d 897, 905 (*Modnick*).) "Family Code section 2120 et seq. provides a comprehensive statutory scheme for setting aside such judgments on grounds of actual fraud, perjury, duress, mental incapacity, or mistake." (*Dale v. Dale* (1998) 66 Cal.App.4th 1172, 1179 fn. 5; § 2122 [grounds and time limits for set aside].) The "trial court's exercise of discretion in refusing to set aside a judgment under section 2122 is subject to reversal on appeal only if we find an abuse of that discretion." (*In re Marriage of Varner* (1997) 55 Cal.App.4th 128, 138.) A court can also set aside a judgment due to extrinsic fraud under Code of Civil Procedure section 473, subdivision (b) and its inherent authority, also subject to deferential review. (*Estate of Carter* (2003) 111 Cal.App.4th 1139, 1154 [former is reviewed for abuse of discretion, and latter for substantial evidence].)

Steven does not establish the trial court abused its discretion in denying his motion to set aside based on fraud.

First, Steven argues that although an attorney mistake in preparing a judgment can be clerical error, where "extrinsic fraud is found, it cannot be simply 'clerical error' . . . ." He then claims that is an issue we can decide, because attorney declarations "are writings that can be reviewed by this court de novo . . . ." But as he acknowledges, the trial court found no extrinsic

fraud, and as we explain next, it could reasonably do so.  Nor can we reweigh evidence, simply because it is in the form of an attorney declaration. (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1323 [reviewing court defers to trial court's resolution of factual determinations, "whether the . . . ruling is based on oral testimony or declarations"]; *ibid.* ["We may not reweigh on appeal a trial court's assessment of an attorney's declaration"].)

Second, Steven offers his own characterization of Shannon's counsel's conduct, instead of addressing the substance of the trial court's ruling:  that there was no evidence of fraud, because although an "incorrect judgment was submitted," the "errors were acknowledged by [Shannon's counsel] as soon as they were brought to her attention."  He forfeits any challenge to this ruling, and would just be asking us to reweigh the evidence anyway.  (*Badie*, *supra*, 67 Cal.App.4th at pp. 784–785; *Ciprari*, *supra*, 32 Cal.App.5th at p. 94.) Even if he preserved the issue, he does not establish it was beyond reason for the court to view Shannon's counsel's conduct as impliedly inadvertent, promptly corrected, and no barrier to Steven " ' "presenting his [case]." ' " (*Modnick*, *supra*, 33 Cal.3d at p. 905.)

Significantly, by the time Shannon's counsel lodged the proposed corrected judgment that was substantially adopted by the court, the main issue—retroactivity language—was gone.  Further, his primary desired relief is to lift the spousal support limits, and, as noted, they did not change in the corrected judgment.  Whatever conduct Shannon's counsel engaged in, Steven does not show it had any bearing on those limits or that set aside would warrant revisiting them.  (Cf. *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 138 [declining to reach "merits of . . . whether the trial court erred by

69

denying the section 995 [set aside] motions"; defendants "cannot establish that any error in this regard was prejudicial"].)

5. *Clerical Error As Grounds for Corrected Judgment*

Finally, Steven argues the trial court erred in finding clerical error as the basis for entering the corrected judgment, and if the changes were not clerical error, the "[j]udgment may be set aside, and the matter remanded for retrial" on spousal support limits. We disagree.

Under Code of Civil Procedure section 473, subdivision (d), a trial court may "correct clerical mistakes in its judgment . . . , so as to conform to the judgment . . . ." Clerical error encompasses " 'all errors, mistakes, or omissions which are not the result of the exercise of the judicial function.' " (*Conservatorship of Tobias* (1989) 208 Cal.App.3d 1031, 1035 (*Tobias*); *Estate of Douglas* (2022) 83 Cal.App.5th 690, 695 [" 'A clerical error . . . includes inadvertent errors made by the court 'which cannot reasonably be attributed to the exercise of judicial consideration or discretion.' "].) "When a signed judgment does not reflect the express judicial intention of the court, the signing of the judgment involves clerical rather than judicial error." (*In re Marriage of Kaufman* (1980) 101 Cal.App.3d 147 (*Kaufman*).)

A court's determination as to clerical error is reviewed for abuse of discretion. (*Tobias, supra*, 208 Cal.App.3d at p. 1036; *id.* at p. 1035 ["Great weight should be placed on the trial court's declaration as to its intention in signing the judgment as the nature of the error is seldom clear from the record or other extrinsic evidence."].)

Steven establishes no abuse of discretion. In his opening brief, his clerical error argument focuses on this court's alleged ability to find fraud de novo—which, he contends, would mean errors in the original judgment were not clerical errors. We rejected that argument above. On reply, he belatedly

70

argues the trial court either did not find clerical error or erred in doing so. Even if not forfeited (*Raceway*, *supra*, 2 Cal.5th at p. 178), these points lack merit too.

First, Steven suggests the trial court did not actually find clerical error. Citing the court's comment that calling it a motion to set aside based on clerical error was "problematic," Steven claims the court "merely [sought] to change the name of the motion to Motion to 'Correct.' " He further asserts the court made "no finding of clerical mistake," other than "references" noting it was correcting the judgment to reflect its intent, and that it found no evidence of a clerical mistake. We disagree. These "references" *were* the court's ruling that it was correcting the judgment (not just clarifying the motion name). And the ruling rested on an implied finding that the errors were clerical in nature, hence the court's ability to address them during an appeal. (Cf. *Hennefer v. Butcher* (1986) 182 Cal.App.3d 492, 506 [court has "power after judgment, pending an appeal . . . to correct clerical errors"]; *Kaufman*, *supra*, 101 Cal.App.3d at p. 151 ["Clerical error, unlike judicial error, is correctable at any time."].)

Second, Steven cites cases regarding the timeliness of appeals from amended judgments, to argue the corrections were substantial. (See, e.g., *Ellis v. Ellis* (2015) 235 Cal.App.4th 837 (*Ellis*).) Some courts in that context focus on whether changes substantially impact party rights, rather than reflect judicial discretion. (*Id.* at pp. 842–843 [dismissing appeal from second judgment as untimely; addressing whether changes materially affected rights, not distinction between judicial and clerical error, and citing other cases using this approach]; but see *Torres v. City of San Diego* (2007) 154 Cal.App.4th 214, 222 [" 'effect of an amended judgment' " on appeal timing turns on whether amendment "substantially changes the judgment" or

" 'simply corrects a clerical error' "].)  These cases do not help Steven, because he does not show any changes were substantial *or* judicial, as we discuss next.  If anything, they underscore that many changes are small, and even apparently big changes can be nonsubstantive in context.  (See *Ellis*, at p. 840 ["only change" was to timing of property division and payment; no change to payment amount or wife's right to receive it]; *Dakota Payphone, LLC v. Alcaraz* (2011) 192 Cal.App.4th 499, 509 [modification to strike damages over requested amount was not substantive, even though it resulted in $4 million reduction].)

Third, Steven identifies changes in the corrected judgment that he claims are substantial and non-clerical (all from the trial court's October 5, 2022 interlineations).

Just one change even tangentially relates to Steven's goal of revisiting spousal support:  the addition of an "effective date of 10/1/21" for spousal support subject to the annual cap.  And the only reasonable interpretation is that the trial court was correcting clerical error.  At trial, the court ruled ongoing spousal support would start October 1, 2021 and would be capped annually at $35,000.  The court also said it was "not imposing the cap prior to October 1, 2021."  In the original judgment, the form indicated support will begin on October 1, 2021, and said, "Please see . . . attachment specifying . . . cap on support of $35,000 per year starting October 1, 2021."  The attachment had a sentence stating the $35,000 cap, but omitted a start date for the cap.  The proposed corrected judgment had the same omission.  At the October 5, 2022, hearing, the court added the phrase "effective October 1, 2021" in the attachment sentence regarding the cap, stating it made the addition to make clear its intent as ordered.

Thus, the trial court did not *change* anything, much less to the point of implicating judicial discretion or party rights. Further, Steven does not explain how he could be prejudiced here. If anything, clarifying the start date confirmed the cap did not apply to arrears, which was favorable to him. And, again, the court was unwilling to change the ongoing spousal support cap, even if it could. (See *Scribner v. Bertmann* (1954) 129 Cal.App.2d 204, 213–214 (*Scribner*) ["Whether we accept . . . the trial court endeavored to correct a 'judicial error' or a 'clerical error', the ultimate judgment, no doubt, would be the same, and no prejudicial error would result."].)

The remaining changes pertain to the income subject to *Ostler-Smith*. Steven characterizes them as follows: "describing what is included in 'stock income' " and taking out the "limitation . . . to 'unrestricted' stock options"; "add[ing]" *Ostler-Smith* percentages to RSU/PRSUs; and "includ[ing] income from vested stock options, PSU's and RSU's . . . in 'stock income', rather than the previous limitation to 'stock option income.' " He does not establish any substantive changes here, either.

At trial, the court ordered *Ostler-Smith* arrears for 2019 to 2021 based on Shannon's bonuses and stock options, including amounts relating to RSU/PRSUs and stock sales. The court also ordered *Ostler-Smith* percentages as part of ongoing support. The original judgment reflected these orders, indicating "[s]tock income" for arrears applied to stock options (which included the RSU/PRSU amounts) and stock sale gains, while ongoing *Ostler-Smith* percentages applied to "all sources" of Shannon's income, "including . . . cash bonuses, vesting stock options, and sale of stocks/options beyond vesting price . . . ." Viewed in context, the changes to the *Ostler-Smith* language in the corrected judgment (i.e., removing the term "unrestricted" in one place, specifying RSU/PRSUs were included, and using

73

"stock income" rather than "stock option income") were *clarifications*, not changes, to these existing orders. Further, Steven does not contend the income descriptions are erroneous, and elsewhere concedes the dollar amounts stayed the same, so it is again unclear how he could show any prejudice. (*Scribner, supra,* 129 Cal.App.2d at pp. 213–214.)

DISPOSITION

The judgment is reversed in part, with respect to vacation pay, and we remand for recalculation of that amount consistent with this opinion. Steven's appeals are dismissed as moot to the extent they challenge the calculation of arrears based on restricted stock units and performance restricted stock units. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


DATO, J.


BUCHANAN, J.


74